[Civ. No. 3293. Third Appellate District.—September 17, 1927.]

SHASTA LUMBER COMPANY (a Corporation), Respondent, v. CHAS. J. McCOY, as Sheriff, etc., Appellant.

Dozier, Kimball & Dozier for Appellant.

W. H. Carlin and Richard Belcher for Respondent.

FINCH, P. J.—In an action prosecuted by the Chicago Lumber Company against Leal & Sons Lumber Company, a writ of attachment was duly issued and placed in the hands of the defendant, who, pursuant to the authority thereof, seized certain lumber claimed by and in the possession of the plaintiff herein. Judgment in that action was rendered in favor of the plaintiff therein and the defendant herein sold the lumber to satisfy the judgment. This action was thereafter commenced to recover the value of the lumber so sold. Judgment was entered in favor of the plaintiff, and the defendant has appealed.

There is evidence to show the following facts: Leal & Sons Lumber Company is a copartnership, composed of Manuel Leal and his sons George and Edward, and was engaged, at the times herein mentioned, in the business of

operating a sawmill at Brownsville, Yuba County, and selling the output of the mill. In the early part of the year 1924 the company was indebted in the sum of more than $20,000 to the Rideout Branch of the Bank of Italy. It was also indebted to the Chicago Lumber Company and probably to others. The plaintiff owned and was operating a lumber-yard in Marysville, where it had been engaged for many years in the business of buying and selling lumber. Early in May, 1924, the plaintiff purchased certain lumber, not involved in this action, from Leal & Sons Lumber Company, and about the same time the latter company entered into an arrangement with the bank and the plaintiff to the effect that Leal & Sons Lumber Company would deliver certain lumber at plaintiff's lumber-yard, the bill of lading, or tag, of each truck load to be indorsed, "Sold to Bank of Italy. Delivered at Shasta Lb. Co." The plaintiff was to sell the lumber "for the benefit of the Bank of Italy and Leal & Sons Lumber Company jointly," the latter to be given credit therefor by the bank. The bank acted as the agent of Leal & Sons Lumber Company in selling the lumber. The plaintiff was given no commission for its services, but was paid the cost of labor in handling the lumber. George Leal testified that in the early part of May, 1924, J. C. Dooley, a representative of the bank, directed the immediate delivery of the lumber, saying, "We want it hauled out of here so nobody can come up here and put an attachment on it." The witness further testified that Dooley "instructed me how to mark the tags, 'Sold to the Bank of Italy.' . . . I said this lumber wasn't sold to the Bank of Italy. He said, 'We want it marked that way so nobody can put any attachment on the lumber down in Marysville.'" It does not appear that this testimony was directly contradicted, but W. B. Swayne, assistant vice-president of the bank, who had charge of the matter, testified that he instructed Dooley to direct Leal & Sons Lumber Company to ship the lumber, but did not direct him to state to that company "that they should ship that lumber down right away so it wouldn't be attached by creditors of Leal & Sons Lumber Company," and that "we told the Leals we wanted the lumber brought down here where it could be handled. They were not able to sell it or move it."

A large quantity of lumber was delivered under this arrangement at the plaintiff's lumber-yard and, after a part thereof had been sold, the bank asked the plaintiff to make an offer for the purchase of the remainder thereof. June 28, 1924, the plaintiff gave the bank a detailed statement of the remainder of the lumber, amounting to 123,326 feet, and offered to purchase the same at $45 per thousand. The offer was oral, the only memorandum thereof in writing being a pencil notation on said statement, substantially as follows: "123,326 Ft. @ $45 per M. $5,549.67." Swayne "said it was all right with the bank but he would rather have the Leals confirm it and he would send them down." Swayne testified that thereafter, on the same day, "all three" of the Leals appeared at the bank and "I showed them the offer . . . made by Mr. Bryan (plaintiff's manager). I told them I would like them to go down and talk to Mr. Bryan and look over the lumber, see the grading and pricing he had made on it. They said they didn't care to go down, that the lumber belonged to the bank; the bank could do as it pleased with it. I said, 'I would like you to go down,' and they did go down at my request." The Leals then went to the plaintiff's place of business and said to Bryan that "it was the Bank of Italy's lumber, they could do as they pleased about it." The Leals did not report back to the bank. Swayne testified that on June 30, 1924, "Mr. Bryan reported to me that the Leals came down and they were satisfied with the grading and price, so I told him the lumber was his." The plaintiff made an entry in its ledger, crediting the bank with the purchase price of the lumber, $5,549.67. This entry "was either made on June 30th or the following day." The lumber was attached, as stated, July 8, 1924, and, of course, the plaintiff had notice of the attachment. July 10, 1924, the bank made and delivered to the plaintiff a bill for the lumber so purchased, dating the bill "June 30, 1924." August 19, 1924, plaintiff gave its promissory note to the bank for the amount of this purchase and other indebtedness to the bank. August 21, 1924, the bank gave Leal & Sons Lumber Company credit for the amount of the sale made to the plaintiff. No record of the sale was made by either the plaintiff or the bank prior to the execution of such promissory note, except as herein stated.

The evidence shows without conflict that Leal & Sons Lumber Company authorized the bank to sell the lumber in question and apply the proceeds to the company's indebtedness to the bank and the important question here is whether the bank made a valid sale to the plaintiff prior to the levy of the attachment. There is sufficient evidence to support a finding either way on that issue. Had the attachment been levied prior to June 30th it would undoubtedly have taken precedence over the sale to the plaintiff. The lumber was already in the possession of the plaintiff and therefore no question as to its delivery is presented. "The title to personal property, sold or exchanged, passes to the buyer whenever the parties agree upon a present transfer, and the thing itself is identified, whether it is separated from other things or not." (Civ. Code, sec. 1140.) Of course, the provisions of this section are subject to the rules relating to fraudulent transfers.

Appellant contends that the sale is void under the bulk sales provisions of section 3440 of the Civil Code to the effect that the sale "of a stock in trade, in bulk, or a substantial part thereof otherwise than in the ordinary course of trade and in the regular and usual practice and method of business of the vendor . . . will be conclusively presumed to be fraudulent and void as against the existing creditors of the vendor," unless prior notice of the intended sale be given as therein prescribed. Admittedly, no such notice was given of the sale in question. The evidence does not show what other lumber, if any, Leal & Sons Lumber Company had at the time of the sale. It cannot be said as a matter of law that the sale of 123,326 feet of lumber by a sawmill company to a company engaged in the business of buying and selling lumber is out of "the ordinary course of trade" or "the regular and usual practice and method of business of the vendor." It has been held generally that statutes substantially in the terms of section 3440 do not apply to vendors of articles manufactured by themselves. (27 C. J. 878; *Connecticut Steam Brown Stone Co.* v. *Lewis,* 86 Conn. 386 [45 L. R. A. (N. S.) 495, 85 Atl. 534]; *Cooney, Eckstein & Co.* v. *Sweat,* 133 Ga. 511 [25 L. R. A. (N. S.) 758, 66 S. E. 257].) The case last cited involved a sale of lumber by the operator of a sawmill. The term "stock in trade" appearing in section 3440 was

doubtless used as the equivalent of "stock of merchandise." In *Swift & Co.* v. *Tempelos,* 178 N. C. 487 [7 A. L. R. 1581, 101 S. E. 8], it is said: "The words 'stock of merchandise,' in our statute, are used in the common and ordinary acceptation of those terms, and mean the goods or chattels which a merchant holds for sale, and are equivalent to 'stock in trade' as ordinarily used and understood among merchants and tradesmen." In *Phillips* v. *Byers,* 189 Cal. 665, 671 [209 Pac. 557, 559], it is said: "One who simply manufactures an article and sells it is not a merchant and . . . although a manufacturer may also be a merchant if he buys and sells goods, he does not become one by disposing of the goods he has produced, at a manufacturer's profit."

Appellant next contends that the transfer to plaintiff "was voluntary and without a valuable consideration and made by said copartnership while insolvent or in contemplation of insolvency and was therefore fraudulent and void as to existing creditors," and that there is no evidence that the sale to the plaintiff was consummated prior to the levy of the attachment. A mere reading of the evidence herein set out is a sufficient answer to these contentions, except as to the question of the company's insolvency. The evidence upon which appellant relies to show that the copartnership was insolvent or contemplated insolvency proceedings was given by Edward Leal as follows: "Q. What, if anything, did Mr. Swayne say concerning a trust deed? A. He said that our business was in very poor condition, the best thing we could do was to go through insolvency." The witness testified that this conversation took place June 28, 1924. Such evidence is insufficient to show either that the copartnership was insolvent or that the transfer was made in contemplation of insolvency. The provision of section 3442 of the Civil Code "that any transfer or encumbrance of property made or given voluntarily, or without a valuable consideration, by a party while insolvent or in contemplation of insolvency, shall be fraudulent, and void as to existing creditors," has no application to the facts of this case, because the transfer was not voluntary but was made for a valuable consideration. "It is well settled that in the absence of express statutory provisions to the contrary, a debtor, although insolvent or in

failing circumstances, may prefer one or more of his creditors by payment in money or other property or by giving security for the debt, and that the preference thus given will be valid, notwithstanding the claims of other creditors will thereby be delayed or defeated.'' (27 C. J. 613.) ''A debtor may pay one creditor in preference to another, or may give to one creditor security for the payment of his demand in preference to another.'' (Civ. Code, sec. 3432.)

Complaint is made of certain rulings by which the court sustained objections to questions asked witnesses for plaintiff on their cross-examination by counsel for defendant. In each instance, however, with one exception, the witness fully answered the question in other parts of his testimony. In the excepted instance Swayne was asked, ''Upon what theory were you ordering Leal & Sons Lumber Company to ship the lumber?'' In appellant's opening brief it is said: ''It is apparent that if the question had been permitted it would have soon developed that the lumber was shipped down for the sole purpose of preventing the attachment thereof by the existing creditors of the copartnership.'' There is nothing in the record to show that the suggested development would have appeared. This suggestion was not made to the trial court nor was any explanation given of the purpose of the question, but the subject was immediately dropped upon the sustaining of the objection. Under such circumstances appellant cannot be heard in this court to complain of the ruling.

The judgment is affirmed.

Glenn, J., *pro tem.*, and Plummer, J., concurred.