FRANKLIN W. KIELB, TRUSTEE IN BANKRUPTCY OF FRANK J. McCLOSKEY, BANKRUPT, PLAINTIFF-APPELLANT, v. J. CLIFFORD JOHNSON, DEFENDANT-RESPONDENT.

Argued November 19, 1956—Decided December 17, 1956.

*Mr. Ira Bernard Dworkin* argued the cause for the plaintiff-appellant.

*Mr. Sidney S. Stark* argued the cause for the defendant-respondent (*Messrs. Stark & Stark,* attorneys).

The opinion of the court was delivered by

OLIPHANT, J. This is an appeal by Franklin W. Kielb, trustee in bankruptcy, from a refusal by the Chancery Division to set aside a transfer of real property from the bankrupt, Frank J. McCloskey, to the defendant, J. Clifford

Johnson, as in fraud of creditors. Since the dispute resolves itself into a challenge of the trial judge's findings of fact, an investigation of the record and a summary account of the evidence presented are necessary.

McCloskey purchased the real estate in question in 1948 for $27,500. A frame building was on the property which was originally used as a gas station and bus depot but converted by the grantors into an automobile agency. The purchase price additionally included some stock in trade and a going gasoline business with its attendant good will.

The subject land has a triangular shape and comprises 4.9 acres in area. It occupies a frontage of approximately 495 feet on the south side of Route 22 in Clinton. In the rear, the land drops rapidly from highway level to the bank of the Raritan River, and the trial judge described the area behind the buildings as having the appearance of "sandy swamp land." There was testimony that despite the erection of a small dike by the bankrupt, the buildings were usually flooded during a rainy period.

After his acquisition, McCloskey used the property for the operation of an automobile dealer agency and an automobile repair business. Apparently his premises were obscured from the view of oncoming motorists by a nearby highway bridge. During the summer of 1951 or 1952 the bankrupt improved his holdings through the addition of a four-bay one-story garage, constructed of cinder block, extending from the original building. Because of the death of the contractor previous to the trial and the destruction of the bankrupt's records by fire, the cost of this extension could not be definitely ascertained, but it was reliably estimated at $22,000.

The court below found that in 1953 the premises in question were listed with various real estate brokers for prices ranging from $45,000 to $75,000. These figures included not only the real estate and attached buildings but also the good will of the bankrupt's business and the personal property used in its pursuit. The bankrupt was never able to secure a purchaser for the prices listed.

64

McCloskey had placed a first mortgage on the premises in the principal sum of $20,000, which in early 1954 was held by the Somerville Trust Company. In addition, it appears the bankrupt's father-in-law had held a second mortgage for $31,000, but it is conceded this was subsequently lifted and its disposition need not concern us. At this time the bankrupt was obviously financially embarrassed for he sought to refinance by procuring a new mortgage of $25,000. Perhaps because of the uncertain prosperity of his business, the bankrupt was not able to obtain a willing mortgagee. Application was made to the defendant, who refused a mortgage loan but offered to purchase the property.

In May 1954 the Somerville Trust Company instituted an action to foreclose on its first mortgage. Evidently a default judgment was entered, since the sheriff eventually listed the property for sale. The bankrupt once again tried to raise money through the issuance of a new mortgage but was unsuccessful. It was only through the efforts of the bankrupt's attorney that an execution sale was postponed in order to give McCloskey an opportunity to rehabilitate himself financially.

Since other potential investors were notably unenthusiastic, the bankrupt finally accepted the defendant's previous offer of $25,000 for the property. The defendant also agreed to pay taxes and interest in arrears, which amounted to approximately $1,234, and to allow the bankrupt to remain in possession of the property rent free from October of 1954, when conveyance was made, until January 1, 1955.

It was orally agreed between the parties that until the first of the year McCloskey would have the right to repurchase the property at a nominal profit to the defendant upon securing a buyer at a higher price. This eventuality never materialized.

McCloskey testified he was motivated to make the sale only by the thought of restoring his deteriorating financial position. He felt that he "might as well get the best that I could get out of it." He received some $6,300 in cash,

and the defendant discharged the default judgment of the Somerville Trust Company which amounted to $18,809.71.

The defendant frankly admits he realized McCloskey was in straitened circumstances, but testified he attributed this to lack of liquidity rather than insolvency.

On March 9, 1955 McCloskey filed a petition in bankruptcy, and thereafter Franklin W. Kielb was appointed as trustee of his estate. The trustee contends the conveyance to the defendant Johnson is voidable under any one of four provisions of the Federal Bankruptcy Act. It is argued that the conveyance was ineffective since it was made for an inadequate consideration, with the intent to defraud and to give an illegal preference to certain creditors. To facilitate clarity of exposition, these points will be separately considered.

At the outset, it is conceded the bankrupt was insolvent at the time the transfer in question was effected. It was also found as an undisputed fact that there were creditors existent, with claims provable under the Federal Bankruptcy Act, when this transaction took place.

The first question we must determine is whether the bankrupt received a fair consideration within the contemplation of 11 *U. S. C. A.*, § 107(*d*)(2)(*a*). This section specifies:

"Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent;
\* \* \*"

This important section of the Bankruptcy Act establishes a test for fraud which is independent of the common law conception of fraud in fact. If the element of fair consideration is absent, the transfer is conclusively presumed to be fraudulent regardless of the actual intent of the transferor. 4 *Collier, Bankruptcy* (1942 *ed.*), 286.

Since the transfer by the bankrupt was not made "to secure a present advance or antecedent debt," 11 *U. S. C. A.*, § 107(*d*) (1) (*e*) (2), the only applicable definition of "fair consideration" is found in 11 *U. S. C. A.*, § 107(*d*) (1) (*e*) (1). This states:

"* * * (e) consideration given for the property or obligation of a debtor is 'fair' (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied * * *"

Aside from clarifying the fact that "fair consideration" is more than a good and valuable consideration and supplying the requirement of good faith on the part of the transferee, the latter section sheds little light on the problem of adequacy. See 4 *Collier, Bankruptcy* (1942 *ed.*), 275 *et seq.* Obviously, in the vast majority of cases the determination of what is "fair" will depend upon a multitude of distinctive circumstances. See, *e. g., Halsey v. Winant,* 258 *N. Y.* 512, 180 *N. E.* 253 (*Ct. App* 1932), *certiorari* denied 287 *U. S.* 620, 53 *S. Ct.* 20, 77 *L. Ed.* 539 (1932); *In re North Babylon Estates, Inc.,* 30 *F.* 2*d* 372 (2 *Cir.* 1928). Since the question of fairness usually devolves into a factual controversy, it follows that the trier of fact should be permitted considerable latitude in arriving at findings. See, *e. g., Epstein v. Goldstein,* 107 *F.* 2*d* 755 (2 *Cir.* 1939); *Pennsylvania Trust Co. v. Schenecker,* 289 *Pa.* 277, 137 *A.* 272 (*Sup. Ct.* 1927).

Here, we have no difficulty in sustaining the determination reached below. As is customary, both parties produced expert testimony by realtors as to the value of the bankrupt's holdings and, of course, their estimates were conflicting. The principal witness for the appellant on this facet of the case placed the value at $42,000. But cross-examination impaired the validity of his estimates by revealing that they were based on sales of other property in the area which were not reasonably comparable. In addition, the bankrupt had previously been unsuccessful in selling his business for

$45,000 or $50,000, although at that time it was listed as a going concern. Furthermore, the conclusion of "fairness" is reinforced by the consideration that the first mortgage on the bankrupt's property had already been foreclosed and that a sheriff's sale was certain to ensue in the immediate future.

The defendant's expert testified the property in question was worth no more than $29,000. The trial judge computed the consideration running from the defendant at approximately $27,234. This figure included $1,234 in back taxes and interest which the defendant had agreed to pay, and what the court below deemed a reasonable rental of $1,000 for the three months the bankrupt was permitted to remain in possession of the premises after the closing. We feel the latter sum was properly taken into account since, in effect, it was bargained for at the time the agreement to convey was executed. See 4 *Collier, Bankruptcy* (1942 ed.), 280; *Farmers' Exchange Bank v. Oneida Motor Truck Co.*, 202 *Wis.* 266, 232 *N. W.* 536 (*Sup. Ct.* 1930).

Realistically speaking, the ultimate test of value is the judgment of available purchasers delivered in the market place. The variation between the estimates of defendant's experts, found most reliable by the trial judge, and the actual purchase price is not substantial enough to warrant overturning the findings. See *Utah Assets Corp. v. Dooley Bros. Ass'n*, 92 *Utah* 577, 70 *P. 2d* 738 (*Sup. Ct.* 1937). We conclude that the price paid by the defendant was a "fair equivalent."

It is to be noted that the statute also requires a finding of good faith on the part of the transferee. Taking into account the superior opportunity of the trial judge to pass upon the credibility of witnesses, we can discover no suitable ground for impeaching his appraisal of the defendant's motive. It appears the defendant knew of the institution of the foreclosure action by the Somerville Trust Company, but that he was unaware of the bankrupt's insolvency. The purchaser's willingness to reconvey the property to McCloskey in the event of his finding a buyer

at a higher price within three months indicates a laudable desire, within the bounds of business prudence, to assist the bankrupt rather than to prey upon his distress.

The trustee further contends, however, that even if made for a "fair equivalent," the transfer is voidable since the transaction was entered into with "actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors." 11 *U. S. C. A.*, § 107(*d*)(2)(*d*).

Intent is an elusive quality of the psyche, and again we must pay proper deference to the findings of the trial judge. 4 *Collier, Bankruptcy* (1942 *ed.*), 306 *n.* 47. Certainly the bankrupt's testimony and his behavior with reference to the questioned transaction do not indicate a purpose to defraud his creditors. McCloskey testified he was animated in making the sale solely by the motive to rehabilitate his rapidly deteriorating financial position. A foreclosure judgment was outstanding against the property, and it was only through the influence of the bankrupt's attorney and the good grace of the mortgagee that an execution sale was temporarily postponed. It is common knowledge that the sheriff seldom sells property for more than the liability assessed against it. On the whole, it would seem that McCloskey performed a service for his creditors by obtaining $6,300 above the amount of the default judgment, to be applied to their claims.

Of course, the debtor would rarely reveal his fraudulent intent by a proclamation of his nefarious purposes. But here, there are none of the outward circumstances which usually conspire to generate suspicion. The purchase price was not unfair in relation to the worth of the property transferred, *cf., e. g., Wilson v. Robinson,* 83 *F.* 2d 397 (2 *Cir.* 1936), and the bankrupt made full disclosure of the terms of the sale and his receipt of the cash proceeds in his bankruptcy schedule. *Cf., e. g., Irving Trust Co. v. State Bankers Financial Corp.,* 40 *F.* 2d 88 (*D. C. S. D. N. Y.* 1930). It is true that McCloskey obtained an agreement to reconvey, but the terms of this agreement and the

time limitation upon its effectiveness preclude a finding of underhanded dealing.

The trustee's final argument in support of his contention that the conveyance is voidable was not offered in the Chancery Division. He now urges that because of the conditional agreement by the defendant to reconvey up until January 1, 1955, a resulting or constructive trust was established on the bankrupt's behalf. It is concluded that this trust did not terminate until the first of the year and that, therefore, the defendant's title was perfected within four months of the petition in bankruptcy. Assuming that a preference was thereby effected, the trustee says the deed is voidable under 11 *U. S. C. A.,* § 96(*a*) and (*b*), or 11 *U. S. C. A.,* § 107(*d*)(3).

The trustee places complete reliance upon *Moses v. Moses,* 140 *N. J. Eq.* 575 (*E. & A.* 1947), for authority as to the creation of either a resulting or constructive trust. We find no comfort for the appellant in that case. There a husband conveyed to his wife without consideration simply for the purpose of establishing separate credit on her part. The court found an unconscionable abuse of the confidential relationship between the parties, amounting to constructive fraud, in the assertion by the wife of a right of absolute ownership to the property in question. A reconveyance was ordered.

Here we can find no actual or constructive fraud on the part of the transferee which would justify invocation of the remedial powers of equity. Since the condition upon which the defendant was to return the property to the bankrupt never materialized, it is clear that defendant's continued retention of title to the property could not conceivably be regarded as an unjust enrichment.

In *Moses v. Moses, supra,* the court also discusses the well-known conditions to the application of the resulting trust doctrine. It is evident that none of them were here fulfilled. 3 *Scott, Trusts* (1939 *ed.*), §§ 404, 404.1; *Restatement, Trusts,* 1245.

Furthermore, even assuming *arguendo* that the conveyance was perfected within four months of the filing of the petition in bankruptcy, the facts *sub judice* do not establish a discriminatory preference within the terms of the statute. The transfer was not made "for or on account of an antecedent debt," and we have already discussed the fact that the transferee had no "reasonable cause to believe that the debtor [was] insolvent." 11 *U. S. C. A.*, § 96(*a*) and (*b*).

It is contended that contrary to 11 *U. S. C. A.*, § 107(*d*)(3), the bankrupt intended to use a major part of the consideration secured from the sale to effect a preference to a third person, the Somerville Trust Company. We, however, can discover no proof offered by the trustee tending to show McCloskey accomplished the transfer in contemplation of filing his petition in bankruptcy. 11 *U. S. C. A.*, § 107(*d*)(3)(*a*).

Furthermore, this position disregards the fact that the trust company was a first lienor upon the premises and that it would have had a charge upon the property even in the hands of the bankruptcy court. 4 *Collier, Bankruptcy* (1942 *ed.*), 2285 *et seq.*

The conclusions of the trial judge as to the factual issues in dispute are eminently justified by the record.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—6.

*For reversal*—None.