Oscar W. ROBERTS, Jr., Trustee in Bankruptcy, Plaintiff,

v.

M. J. NORRELL, Defendant.

Civ. A. No. 1199.

United States District Court
N. D. Alabama, E. D.

Jan. 14, 1963.

, Clinton J. Morgan, of Rogers, Magruder, Hoyt, Wright & Walther, Rome, Ga., and Lybrand, Sides & Casey, Anniston, Ala., for plaintiff.

Merrill, Merrill, Vardaman & Williams, Anniston, Ala., for defendant.

LYNNE, Chief Judge.

This suit is by a trustee in bankruptcy to recover the fair market value of thirteen motor vehicles sold prior to their bankruptcy by Owell Foster and Dewey E. Walls, doing business as Foster-Walls Motor Company, a partnership, to the defendant, M. J. Norrell, contending in the alternative that such sale constituted a fraudulent transfer under the provisions of either Section 70, sub. e or Section 67, sub. d(3) of the Bankruptcy Act, 11 U.S.C.A. §§ 110, sub. e and 107, sub. d(3).

From approximately February 1959 until their bankruptcy, Owell G. Foster and Dewey E. Walls operated in Bowdon, Carroll County, Georgia, the Foster-Walls Motor Company, engaging in the retail sale of new Ford and used automobiles and trucks and in repairing and servicing motor vehicles. From its commencement the partnership had borrowed quite heavily from Woodrow McLeod, Foster's father-in-law, who interested himself in the sales activities of the partnership. At least part of this indebtedness was secured, although it appears that the security might not have been given until an undetermined time within four months of the filing of the petition in bankruptcy.

From conflicting evidence the court has proceeded to reconstruct the circumstances surrounding the sale under attack. Several days prior to the date of the transfer, one or both of the partners of Foster-Walls telephoned Ed Pepper, who operated an automobile leasing business at Ashland, Alabama, and who for some time had mentioned informally to Walls that he might be interested in acquiring a number of vehicles for his business, to inquire whether Pepper was interested at that time in purchasing any automobiles from Foster-Walls. After preliminary negotiations by telephone and in Bowdon, Walls went, on July 16 or 17, 1960, to Ashland, where Pepper agreed to purchase thirteen assorted 1960 model Ford vehicles at a cost per unit averaging approximately $250 below factory invoice price. Upon learning, however, that the number of trucks in the lot was too large for use in his leasing business, Pepper, either immediately before or after delivery of the vehicles at his house during the evening and early night of July 18, asked Norrell, who operated a Pontiac automobile and GMC truck agency in Ashland, whether he would be interested in buying them.

The following morning, July 19, Norrell examined the vehicles parked at Pepper's house; then went with his attorney, Sam McKay, to Carrollton, the county seat of Carroll County, Georgia, for the purpose of searching the records to determine whether the vehicles were incumbered. Finding only a mortgage in favor of Woodrow McLeod, in an undetermined principal amount, on repair

parts owned by Foster-Walls, they returned to Ashland, and Norrell communicated to Pepper his assent to the transaction. Pepper then delivered to Norrell signed blank bills of sale and factory invoices. Norrell's bookkeeper prepared the check, made payable jointly to "Foster & Walls Ford Co. & Woodrow McLeod" in the amount of $23,935.63, which Pepper delivered either to Walls or McLeod, who were waiting in their car at Pepper's house.

On July 28, 1960, Motor Contract Company of Atlanta filed in the District Court for the Northern District of Georgia a petition in involuntary bankruptcy proceedings against the partnership and against Foster and Walls individually. Motor Contract, which had "floor-planned" the vehicles sold by Foster-Walls, alleged an unsecured claim against Foster-Walls in the amount of $2,587.23 and that the partnership's disposition of the vehicles constituted an act of bankruptcy. On March 8, 1961, the debtors withdrew their answer, admitted insolvency, and consented to adjudication; whereupon they were adjudicated bankrupts.

On May 17, 1962, the District Court for the Middle District of Alabama granted summary judgment in favor of the trustee and against Woodrow McLeod in the principal sum of $28,795.13, representing the amount claimed by the trustee to have constituted preferential or fraud-ulent transfers by the bankrupts to McLeod, which claim included the amount of $23,935.63 paid to McLeod as a result of the transaction involved here. By order of October 31, 1962, that case was marked "settled" by a compromise for the sum of $15,148.00.

■ In the first count of his complaint, the trustee invokes the aid of a state bulk sales act by proceeding under Section 70, sub. e of the Bankruptcy Act.[1] There is sharp disagreement between the trustee and the defendant as to whether the applicable state law is that of Georgia, for which the trustee contends, or that of Alabama. Since the bulk sales acts of the two states differ materially, a choice-of-law problem is initially posed. A subordinate threshhold question is whether, in applying state law assimilated in the Bankruptcy Act, a federal court is governed by the choice-of-law rules of the forum state, as required in cases in which jurisdiction is based upon diversity of citizenship,[2] or whether the choice is to be made in accordance with a rule fashioned by the federal court as part of its general problem of applying the Act.[3] Both the Supreme Court[4] and the Fifth Circuit[5] have carefully avoided a decision of this question in the context of the Bankruptcy Act, and since in the present case the same result is achieved by application of either the Alabama choice-of-law rule *or* what is independently determined to be the pre-

---

1. Section 70, sub. e provides in part:
   "(1) A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, *under any* Federal or *State law applicable thereto*, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor." [Emphasis added.]

2. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

3. See remarks of Judge Goodrich, In re Rosen, 157 F.2d 997, 999 (3d Cir., 1946), cert. denied, 330 U.S. 835, 67 S.Ct. 972, 91 L.Ed. 1282 (1947); and 1A Moore,

Federal Practice Par. 0.322 [1], at 3728 (2d ed. 1961).

4. See McKenzie v. Irving Trust Co., 323 U.S. 365, 371 n. 2, 65 S.Ct. 405, 89 L.Ed. 305 (1945); Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). In Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), the Court was also able to avoid this question in respect to the Federal Tort Claims Act since that Act itself made the initial reference to "the law of the place where the act or omission occurred." 369 U.S. at 6, 82 S.Ct. at 589, 590, 7 L.Ed.2d 492.

5. Fahs v. Martin, 224 F.2d 387, 396 (5th Cir., 1955).

ferred rule, here too the problem will be left unanswered.

In determining the formal and substantial validity of conveyances of tangible movables, the most widely held modern view is that the law of the actual physical situs of the property at the time of the transfer controls.[6] This principle is considered applicable generally to fraudulent transfers [7] and more particularly to bulk sales.[8] However, plaintiff contends, following the fictive maxim *mobilia sequuntur personam*, that the situs of personalty is the domicile of its owner. It is true that for some purposes the domicile still is determinative, while for others it is not; certainly no uniform rule embracing all transactions and interests in property can be stated.[9] The cases [10] cited by plaintiff which, relying on this maxim, hold that a federal tax lien is valid as against third-party purchases of personalty if filed at the owner's domicile are simply inapposite to the question of the validity of a sale or transfer of chattels, to which the decisions apply a different rule. Furthermore, in the tax-lien decisions, equitable and practical considerations are also involved, as expressed in Grand Prairie State Bank v. United States, 206 F.2d 217, 219 (5th Cir., 1953): "To hold otherwise, would be to overlook the practical necessities of the situation and would require the Collector to file tax liens in every jurisdic-

tion to which the taxpayers may at any time remove the property." But as to choice of the law by which the validity of a chattel conveyance is to be determined, the practical and equitable considerations are quite different. In Royal Baking Powder Co. v. Hessey, supra, the Fourth Circuit was urged to apply the New York Bulk Sales Act to a transfer of property situated in Argentina when the sale was consummated through a New York contract. Holding the New York Act applicable, Judge Soper, after a discussion of the above-mentioned sections of the Restatement concerning the validity of conveyances of chattels, observed in 76 F.2d at 649 that, "If the rule were otherwise, purchasers at the place where the merchandise is situated would be charged with knowledge of the laws of a foreign jurisdiction." It might be added that because of the substantial affirmative responsibilities placed upon the purchaser by bulk sales acts, this statement has particular significance in respect to such statutes.

■ Although it appears that Alabama courts have not had occasion to decide the particular question of choice of law as respects bulk sales, the recent case of McRae v. Bandy, 270 Ala. 12, 115 So. 2d 479 (1959), and the authorities relied upon there, demonstrate that the Alabama choice of law rule is in accord with the above-discussed principle that the

6. Cook & Sons Equip., Inc. v. Killen, 277 F.2d 607, 611 (9th Cir., 1960); Restatement, Conflict of Laws §§ 256 & 257 (1934); 2 Beale, Conflict of Laws §§ 256.-1 & 257.1 (1935); 15 C.J.S. Conflict of Laws § 18d(1), at pp. 929–930; Beale, "The Situs of Things," 28 Yale L.J. 525, 528 (1919); 11 Am.Jur. Conflict of Laws § 69 (1937).

7. Restatement, Conflict of Laws § 257, Comment b; 37 C.J.S. Fraudulent Conveyances § 3. See Annot., "Conflict of laws as regards validity of fraudulent and preferential transfers and assignments," 111 A.L.R. 787, 799 (1937).

8. 37 C.J.S. Fraudulent Conveyances § 475, at p. 1325; In re Central Metallic Casket Co., 273 F.2d 506, 510 (7th Cir., 1960), aff'g 170 F.Supp. 320 (E.D.Wis.1959); Royal Baking Powder Co. v. Hessey, 76

F.2d 645 (4th Cir.), cert. denied sub. nom. Lowendahl v. Hessey, 296 U.S. 595, 56 S.Ct. 110, 80 L.Ed. 421 (1935); Rosenbaum v. Consolidated Products Co., Sup., 81 N.Y.S.2d 571, aff'd 276 App. Div. 1069, 96 N.Y.S.2d 490.

9. See, e. g., 15 C.J.S. Conflict of Laws § 18b.

10. E.g., Grand Prairie State Bank v. United States, 206 F.2d 217 (5th Cir., 1953); Solomon v. Gross, 176 F.Supp. 836 (D.N.J.1959). Cook & Sons Equip., Inc. v. Killen, 277 F.2d 607 (9th Cir., 1960), also cited by plaintiff, stands squarely for the view that the law of the actual physical location of the property, "usually the place where the chattel is delivered to the buyer", is the proper choice of law.

validity of the conveyance of a chattel is controlled by the law of the state where the chattel is actually situated at the time of the transfer.

■ The undisputed evidence at trial establishes that the vehicles involved in the present case were located in Ashland, Alabama, at the time their transfer was consummated. The provisions of the Alabama Bulk Sales Act therefore control.

■■ It is stipulated by the parties that defendant Norrell made no attempt to comply with the provisions of any bulk sales law. The Alabama Bulk Sales Act, Ala.Code, Tit. 20, § 10 (Recomp.1958), provides:

> "A sale of any portion of a stock of merchandise otherwise than in the ordinary course of trade or in the regular and usual prosecution of the seller's business *and* a sale of an entire stock of merchandise in bulk or substantially in bulk *shall be presumed to be fraudulent and void as against the creditors of the seller*, and the purchaser thereof shall be considered to hold the merchandise in trust as trustee for the benefit of the creditors of the seller for a period of ninety days from the date of sale, unless at least 10 days before the sale: The seller shall have * * *. [Emphasis added.]"

It must first be determined whether the Act applies to the transaction in this case; if it does, then it must be determined whether the purchaser, Norrell, has met his burden [11] of rebutting the presumption [12] of fraud.

■■ According to the testimony of credible witnesses, the thirteen vehicles sold to Norrell did not comprise the "entire stock of merchandise" of the Foster-Walls Motor Company, and there remained after the transaction some twelve to fifteen used vehicles plus a substantial inventory of automotive repair parts. Consequently, the sale to Norrell does not come within the second alternative prerequisite to application of the Act, viz., "a sale of an entire stock of merchandise in bulk or substantially in bulk." [13] Therefore, in order that the sale in question may be found to have violated the Act, it must have been "otherwise than in the ordinary course of trade or in the regular and usual prosecution of the seller's business." It is precisely the defendant's contention that this sale was in the ordinary course of the seller's business.

Dewey E. Walls testified that the transferor partnership had never sold more than four new automobiles to a single purchaser in a single transaction (and that sale had occurred only two weeks previously) and had never sold new automobiles at below factory invoice price. But it also appears [14] that the partnership commenced business only in February 1959, so that it had been engaged in business only one season other than the one in which the transaction took place.

There was some conflict in the evidence concerning the commonness of such a transaction among automobile dealers generally in this area and at that time of the year. L. C. Vanedo, a representative of the Motor Contract Company, the

---

11. Terry v. McCall Co., 203 Ala. 141, 82 So. 171 (1919).

12. Unlike some other similar statutes, the Alabama Act has been construed as raising only a rebuttable, not a conclusive, presumption. See Crisp v. First Nat. Bank, 224 Ala. 72, 139 So. 213 (1932); Johnston Bros. Co. v. Washburn, 16 Ala. App. 311, 77 So. 461, cert. denied, 201 Ala. 698, 77 So. 1002 (1917).

13. In the Alabama Act, unlike those of some other states, the word "substantial-

ly" obviously modifies the term "in bulk" and not the phrase "entire stock of merchandise." See Miller, Bulk Sales Laws: Meaning to Be Attached to the Quantitative & Qualitative Requirements Phrases of the Statutes," 1954 Wash.U.L.Q. 283, 301 n. 76 and 313 (1954).

14. Item 1(c) of the Statement of Affairs of the Partnership Petition in Bankruptcy, Plaintiff's Exh. No. 4.

petitioning creditor in the involuntary bankruptcy proceeding, testified that in his opinion the transaction was highly unusual; that in his experience mid-July is normally too early in the automobile year for sales below invoice price, and that sales or exchanges of automobiles in quantity lots between dealers with different franchises are uncommon.

M. J. Norrell, defendant herein and an automobile dealer for some twenty-one years, considered a transaction of this sort under the circumstances of time and locale quite common. The defendant's witness, Lloyd Plunkett, the only witness on this point without some apparent interest in the controversy, testified at some length on the practices of the trade. A long-time used automobile dealer at Anniston, Alabama, Mr. Plunkett testified that he had often purchased new automobiles from dealers for sale in his business, and that it is common to buy in lots of more than ten vehicles. Outlining his observation of the annual performance of the new-car market, he stated that there is generally a market sag after July 4th until the introduction of new models in October, and that in his experience new automobiles were often sold at prices below factory invoice during that period of the year; the 1960 model, he stated, had proved to be the most undesirable of recent-model Ford automobiles.

What meaning is to be attached to the phrase, "the ordinary course of trade or business"? A number of decisions have required the transaction to be ordinary in the past experience and dealings of that particular seller, thereby excluding consideration of custom and usage in the general type of business of the seller.[15] But it is clear that the contrary view [16] prevails in Alabama. As it happens, the only Alabama decision construing the term, "ordinary course of trade," as used in the Bulk Sales Act involved an auto-

mobile dealer. In that case, Farris v. State, 130 So.2d 54 (Ala.App.1960), cert. denied, 272 Ala. 278, 130 So.2d 58 (1961), Farris was charged with the sale or removal of automobiles for the purpose of hindering, delaying, or defrauding Associates Discount Corporation, holder of trust receipts on the vehicles, in violation of Ala.Code, Tit. 14, § 363. The court set out, in 130 So.2d at 56, the following facts pertinent to the present case:

"On Sunday, May 31, 1959, Farris sold the twelve cars to Jenkins Motor Company of Mobile at a gross sale price of $7,000. In the trust receipts he had promised not to sell below a total of $9,625. Associates later repossessed the automobiles and sold them at auction for $12,590.

"Farris had sold single cars to Jenkins several times beforehand. * * *

* * * * * *

"Mr. W. R. Alford, branch manager for Associates, testified for the prosecution that on Monday morning, June 1, he went by * * * [the defendant's place of business] and found only three 'old model' cars on the car lot there. Defense witness, Mr. Farris's bookkeeper, testified that after the sale to Jenkins there were about ten to twelve other automobiles on the lot, and that Mr. Farris had another lot which remained in business at least two or three weeks after the transaction on May 31."

The terms of the trust receipt permitted sale of the cars only "in the ordinary course of trade." In concluding that the transaction did not violate that restriction, the court remarked, id. at 57:

"Moreover, should we turn to the construction placed upon the expression 'in the ordinary course of trade' in the Bulk Sales Act, for analogy,

15. E.g., Jubas v. Sampsell, 185 F.2d 333 (9th Cir., 1950); Irving Trust Co. v. Rosenwasser, 5 F.Supp. 1016 (S.D.N.Y.1934); Cohen v. Calhoun, 168 Miss. 34, 150 So. 198 (1933).

16. E.g., Sternberg v. Rubenstein, 305 N.Y. 235, 112 N.E.2d 210, 36 A.L.R.2d 1136 (1953); dissenting opinion of Judge Etheridge, Cohen v. Calhoun, supra, 168 Miss. at 41, 150 So. at 199.

we also should consider the sale to Jenkins exempt. New York Credit Men's Ass'n v. Domestic Broadtail Producers, D.C., 61 F.Supp. 102; Sternberg v. Rubenstein, 305 N.Y. 235, 112 N.E.2d 210, 36 A.L.R.2d 1136 [1953] (sale of 1300 pairs of 'off season' shoes not a sale 'otherwise than in the ordinary course of trade' as used in N.Y.Bulk Sales Act, Personal Property Law, § 44); Shasta Lbr. Co. v. McCoy, 85 Cal. App. 468, 259 P. 965.

"The Supreme Court of Oklahoma, in Stemmons, Inc. v. Universal C. I. T. Credit Corp., Okl., 301 P.2d 212, 217, took judicial notice of the 'wheeling and dealing' practices of automobile dealers involving the construction of a chattel mortgage as affected by a statute which confers some of the attributes of a trust receipt. The court said, pertinently:

" ' * * * most particularly since the end of the last war, it is known and recognized that automobile dealers generally transfer, trade and sell automobiles among themselves as a matter of convenience. Not only is this the common practice between so-called authorized dealers, but the practice is even more prevalent between authorized dealers and the licensed used car dealers. And, whether such transactions are for convenience in reducing a stock of merchandise, by way of financial retrenchment, or because of the opportunity for profit, the one fact remains that in every instance there was a complete sale to a purchaser who gave value to a dealer, who made advantageous disposition of a unit of merchandise which he handled in the ordinary course or conduct of his business. * * * ' "

Though mindful of the fact that Farris was a criminal case, it is difficult to escape the impression, on consideration of the facts on which that decision was based, that it very nearly requires that the sale in the present case be held as a matter of law to have been made in the ordinary course of the seller's business. There is present in the instant case, moreover, the satisfactory testimony of Mr. Plunkett to the same effect. It is therefore concluded that the sale of such vehicles was made in the ordinary course of business and was not in violation of the Alabama Bulk Sales Act. Since, therefore, no presumption of fraudulent intent is raised, consideration of defendant's evidence in rebuttal thereof is pretermitted.

■ By Count Two of his complaint, the trustee attacks the transfer as fraudulent under Section 67, sub. d(3) of the Bankruptcy Act, as amended, 11 U.S.C.A. § 107, sub. d(3).[17] In order to sustain his position under this provision the trustee has the burden [18] of proving that (1) the debtor has made a transfer of his property; (2) the debtor was insolvent at the time or as a result of the transfer; (3) the transfer became effective within four months of the filing of the petition in bankruptcy; (4) the transaction was entered into in contemplation of the filing

17. Section 67 subd. (3) provides:
"Every transfer made and every obligation incurred by a debtor who is or will thereby be rendered insolvent, within four months prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent, as to then existing and future creditors: (a) if made or incurred in contemplation of the filing of a petition initiating a proceeding under this title by or against the debtor or in contemplation of liquidation of all or the greater portion of the debtor's property, with intent to use the consideration obtained for such transfer or obligation to enable any creditor of such debtor to obtain a greater percentage of his debt than some other creditor of the same class, and (b) if the transferee or obligee of such transfer or obligation, at the time of such transfer or obligation, knew or believed that the debtor intended to make such use of such consideration. The remedies of the trustee for the avoidance of such transfer or obligation and of any ensuing preference shall be cumulative: *Provided, however,* That the trustee shall be entitled to only one satisfaction with respect thereto."

18. 4 Collier, Bankruptcy Par. 67.43 (14th ed. 1962).

of such a petition or in contemplation of liquidation of all or the greater portion of the debtor's property; (5) the transaction was entered into with the intent to use the consideration obtained to enable any creditor of the debtor to obtain a greater percentage of his debt than some other creditor of the same class; and (6) the transferee knew or believed at the time of the transaction that the debtor intended to make such use of the consideration.[19] Clearly the first and third requisites have been satisfied. As to the others, however, there is doubt.

There are few reported decisions applying or construing Section 67, sub. d(3), especially since its amendment in 1952 to conform more clearly[20] to the rule of Dean v. Davis, 242 U.S. 438, 37 S. Ct. 130, 61 L.Ed. 419 (1917), which the provision's original enactment in the Chandler Act of 1938 intended to codify.[21] One of the key prerequisites to the transferee's implication under the rule of Dean v. Davis, which requirement was expressly added to the statutory provision in 1952, is that the transferee have knowledge or belief that the debtor intended to use the consideration "to enable any creditor of such debtor to obtain a greater percentage of his debt than some other creditor of the same class." In applying this element of the rule of Dean v. Davis, the courts have "required participation in the bankrupt's scheme by the transferee or at least such knowledge as negatived his good faith."[22]

■ It is the opinion of the court that the evidence in this case fails to show that Norrell had or should have had such knowledge or belief of the debtor's intentions. Norrell had only the slightest acquaintance with the bankrupts, Mc-

Leod, and their business operation in Bowdon, Georgia. It was not until immediately before or after delivery of the vehicles at the home of Ed Pepper at Ashland, Alabama, that Norrell was involved in the transaction at all, and his dealings then were solely with Pepper. In all of the evidence only two facts provide any material basis for the inferences urged by the trustee: (1) Norrell's knowledge, acquired in searching the Carroll County, Georgia, court records on the day of the sale, that McLeod was a secured creditor of Foster-Walls; and (2) the fact that Norrell's check was made payable jointly to Foster-Walls and McLeod. But knowledge of this sole indebtedness proves nothing.

Norrell states that he gave no attention to the nature or amount represented by the instrument against other property of Foster-Walls, since he was interested only in acquiring clear title to the vehicles, and that he did not know any of the present bankrupts had any creditors other than McLeod. Nothing indicates this was not so. Even assuming, therefore, that Norrell knew or should have known that the sum in his check was to be used wholly or in part to discharge the antecedent indebtedness to McLeod, it cannot be concluded on the available evidence—which shows Norrell had knowledge of *only one* creditor, who was secured—that he knew or believed that such consideration could be used to enable McLeod "to obtain a greater percentage of his debt than some other creditor of the same class." It should be added, moreover, that while it is not altogether clear why McLeod was made a joint payee on the check,[23] the evidence is not convincing that it was done in participation in, or with knowledge of, any then existing

---

19. Ibid., Par. 67.38, at 387–89.

20. Ibid. at 386.

21. Analysis of H.R. 12889, 74th Cong., 2d Sess. 216 (1936).

22. 4 Collier, Bankruptcy Par. 67.38, n. 28, at 390.

23. Norrell testified orally at trial that it was suggested by Ed Pepper that McLeod

be named as a payee. Mr. Pepper testified that he does not recall having made such a suggestion. At page 18 of the deposition, introduced as Plaintiff's Exh. No. 7, Norrell stated that McLeod's name was added because, "I felt like since he was making the deal—Mr. Pepper said that he was the man down at his house—and I felt like it would be safe to add his name to it."

ulterior intention on the part of the transferors.

There is lacking, furthermore, proof of one other factor implicit in the requirement that the transferee have knowledge or belief of the debtor's intent to prefer a creditor. As observed in 4 Collier, Bankruptcy Par. 67.38, at 390, "Such a belief or knowledge undoubtedly includes a realization or surmise, at least, that the debtor is insolvent." Norrell testified that he had no such knowledge until the bankruptcy hearing, and there is no evidence from which it could be concluded that he surmised that Foster-Walls or its partners were in poor financial condition.[24]

In fact, there is insufficient evidence that the bankrupts actually were insolvent at the time of the transfer, another element the trustee must prove under Section 67, sub. d(3). For proof of insolvency, under the pertinent definition thereof in Section 67, sub. d(1) (d), the trustee evidently relies upon bankrupts' schedules (included in Plaintiff's Exh. No. 4), prepared nine months after the transfer here attacked, and the appraisal of certain personal property of the partnership (included in Plaintiff's Exh. No. 5), prepared ten months after the transfer. The adjudication is, of course, no evidence of insolvency at a time prior to that when the petition was filed, especially in a suit by the trustee against a third party.[25] The bankrupts' schedules or other indicia are considered sufficient evidence of the financial condition of his business at an earlier time only if there is adequate proof—by direct evidence or by inference from the short time span or the fact that the business was historically in wretched condition—that there has been an insubstantial change in its condition during the interim.[26] But in the absence of such additional factors, evidence of insolvency at a later date cannot be retrojected to the prior time for which it must be proved.[27]

Assuming that the patently sketchy schedules in the present case accurately reflect the bankrupts' condition at the time of the adjudication or the filing of the involuntary petition, the trustee has made no attempt to relate this condition to the critical time. In point of fact, the evidence is decidedly to the contrary. For the testimony showed that immediately after the transfer herein attacked the partnership owned at least some assets—twelve to fifteen used automobiles of unknown value—which do not appear on the schedules. We are, in short, left to guess at the bankrupts' condition at the time of the transfer. Here, in contrast with adjudication, the burden of proving insolvency rests with the trustee, and he has not met it.

It is concluded, therefore, that the sale of the vehicles was not fraudulent within the provisions of Section 67, sub. d(3). Consequently, defendant's further defense that the settlement of the trustee's judgment against Woodrow McLeod in the District Court for the Middle District of Alabama precludes, by virtue of the proviso to Section 67, sub. d(3), any recovery in this suit, is not reached.

Judgment for defendant is due to be entered in conformity with this opinion.

24. The total evidence clearly fails to disclose that Norrell had the intimate knowledge of the debtor's business that induced the court in Lovett v. Faircloth, 10 F. 2d 301 (5th Cir., 1925), to apply the rule of Dean v. Davis. And compare Kielb v. Johnson, 23 N.J. 60, 127 A.2d 561 (1956).

25. Liberty Nat'l Bank of Roanoke v. Bear, 265 U.S. 365, 370, 44 S.Ct. 499, 68 L.Ed. 1057 (1924).

26. See, e. g., Langham, Langston & Burnett v. Blanchard, 246 F.2d 529, 532 (5th Cir., 1957); Mitchell v. Investment Securities Corp., 67 F.2d 669 (5th Cir., 1933); In re Great Western Biscuit Co., 85 F.Supp. 314 (S.D.Cal.1949).

27. E.g., Hicks Co., Ltd. v. Moore, 261 F. 773 (5th Cir., 1919); Everett v. Warfield Mining Co., 37 F.2d 328 (4th Cir., 1930); Arkansas Oil & Mining Co. v. Murray Tool & Supply Co., 127 F.2d 564, 566 (8th Cir., 1942); McClung-Logan Equip. Co. v. Friedman, 195 F.2d 516 (4th Cir., 1952).