Louis Sternberg, as Trustee in Bankruptcy of Harold B. Fink, Doing Business under the Name of Delaware Bootery, Respondent, *v.* Jack Rubenstein, Appellant.

Argued January 21, 1953; decided April 16, 1953.

*Victor Levine* and *Benjamin M. Gingold* for appellant. A type of sale which recurs regularly in a business is not a sale in bulk and is made in the ordinary course of trade and in the regular prosecution of that business. (*Feldstein* v. *Fusco,* 205 App. Div. 806; *Mott* v. *Reeves,* 125 Misc. 511, 217 App. Div. 718, 246 N. Y. 567.)

*Donald S. Day* for respondent. I. This was a sale in bulk otherwise than in the ordinary course of trade and in the regular prosecution of the bankrupt's business. (Personal Property Law, § 44; *Jubas* v. *Sampsell,* 185 F. 2d 333; *Irving Trust Co.* v. *Rosenwasser,* 5 F. Supp. 1016; *Conquest* v. *Atkins,* 123 Me. 327;

*Klein* v. *Maravelas,* 219 N. Y. 383.) II. This was a sale in bulk as contemplated by the New York Bulk Sales Act. (*Mott* v. *Reeves,* 125 Misc. 511, 217 App. Div. 718, 246 N. Y. 567.)

FULD, J. Plaintiff trustee in bankruptcy, acting on behalf of creditors, sues to hold defendant Jack Rubenstein accountable, under the Bulk Sales Act (Personal Property Law, § 44), for the value of a batch of " off-season " shoes sold to Rubenstein by the bankrupt, Harold B. Fink. The question presented is whether, under the statute, the sale of such " off-season " merchandise constitutes a sale " in bulk   *   *   *   otherwise than in the ordinary course of trade and in the regular prosecution of said business ".

Three weeks before Christmas, 1948, Fink opened a family shoe store in Buffalo, New York. At a cost of some $25,000, he stocked the store with men's, women's, and children's shoes. By the following May, Fink's inventory had declined to around $19,000 and still consisted, in part, of fall and winter styles. To clear his shelves of those " off-season " shoes, as well as to obtain cash to pay debts and thus obtain credit for the purchase of new summer stock, Fink sold some thirteen hundred pairs of shoes — described as " obsolete " in the record — for $3,549.50 to Rubenstein, a dealer in leftover footwear. Although Fink concededly did not comply with the requirements of the Bulk Sales Act, nowhere is there the slightest intimation that he did not secure the best price available for his goods, and, as was found by the Official Referee before whom the case was tried, " There is nothing to indicate " that there was any intention " to defraud any of the [seller's] creditors ". There was no discontinuance of any branch of Fink's business or of any line or brand of merchandise carried by him, and actually the sale to Rubenstein did not include Fink's entire stock of " off-season " shoes. Fink continued in business for six months after the sale, until the filing of the petition in bankruptcy in November of 1949.

The Official Referee concluded that the sale to Rubenstein " was in the ordinary course of the bankrupt's business ", and directed dismissal of the complaint. The Appellate Division reversed, its view being that the " regular and usual practice and method of business " of retail shoe merchants " was selling

shoes to those who came into the store to buy from the stock in trade for wear." (279 App. Div. 30, 31.) Following an accounting, upon remission of the matter to Special Term, judgment was rendered directing Rubenstein to pay the trustee the sum of $3,549.50, and, from that judgment, Rubenstein appeals directly to this court, seeking review only of the Appellate Division's determination (Civ. Prac. Act, § 590).

Decision turns upon the following language: " The sale * * * in bulk of any part or the whole of a stock of merchandise * * * pertaining to the conducting of the business of the seller * * * otherwise than in the ordinary course of trade and in the regular prosecution of said business, shall be void as against the creditors of the seller," unless there is compliance with certain specified requirements (Personal Property Law, § 44).[1] Failure on the part of the purchaser to " conform " to these requirements, it is recited, shall, upon application of any of the seller's creditors, render him " a receiver * * * accountable to such creditors for all the goods * * * that have come into his possession by virtue of such sale ". In our view, both the design and scope of this section make clear that the words, " otherwise than in the ordinary course of trade and in the regular prosecution of * * * business," were meant to exempt the sale of " off-season " shoes — merchandise rendered " obsolete " by the passage of time.

Section 44 derives from legislation first enacted in 1902. (L. 1902, ch. 528, held unconstitutional in *Wright* v. *Hart,* 182 N. Y. 330; amd. by L. 1904, ch. 569; L. 1907, ch. 722; L. 1914, ch. 507, held constitutional in *Klein* v. *Maravelas,* 219 N. Y. 383, 387, overruling *Wright* v. *Hart, supra,* 182 N. Y. 330; see, also, Note, 2 Corn. L. Q. 28.) By 1916, similar provisions had been

---

1. Among the conditions enumerated are these: (1) the seller must give the purchaser, at least ten days before the sale, " a full and detailed inventory," showing the quantity and the cost price of each article to be sold; (2) the purchaser must retain " said inventory " for at least ninety days for inspection by any creditor of the seller; (3) the purchaser must obtain a list of the names and addresses of such creditors, with the amount of the indebtedness owing to each; and (4) the purchaser must notify personally or by registered mail every creditor of the proposed sale, of its terms and conditions, at least ten days before he takes possession of or pays for the merchandise involved.

adopted, largely through the efforts of the National Association of Credit Men, in every state of the nation. (See *Klein* v. *Maravelas, supra,* 219 N. Y. 383, 385; see, also, Billig, Bulk Sales Laws: A Study in Economic Adjustment, 77 U. of Pa. L. Rev. 72, 81–99.) In the words of that Association's first president, these laws generally were aimed at curbing " a favorite indoor sport of three decades ago " when " the fraudulently inclined debtor  *  *  * [could] sell his stock in bulk, pocket the proceeds and laugh at his creditors.'· (Tregoe, 29 Credit Monthly, pp. 11, 12.) In particular, the statutes were designed, the draftsmen of the Proposed Uniform Commercial Code have written, to discourage " two common forms of commercial fraud, namely: (a) the merchant, owing debts, who sells out his stock in trade to a friend for less than it is worth, pays his creditors less than he owes them, and hopes to come back into the business through the back door " and " (b) the merchant, owing debts, who sells out his stock in trade to any one for any price, pockets the proceeds and disappears leaving his creditors unpaid." (Comment to § 10–101, Proposed Uniform Commercial Code, Final Draft [Spring, 1950], p. 819; see, also, *Mott* v. *Reeves,* 125 Misc. 511, 512–513, affd. 217 App. Div. 718, affd. 246 N. Y. 567; Sixth Annual Report of N. Y. Judicial Council, 1940, pp. 383–384.)

Recognizing the onerous nature of the restrictions imposed upon transactions within its scope, this court early construed the Bulk Sales Act as being meant to apply only in " rare and irregular cases ", only to the " extraordinary sale  *  *  * such as can occur but few times in the life of a merchant ". (*Wright* v. *Hart, supra,* 182 N. Y. 330, 356, 357, per VANN, J., dissenting — whose dissent was later adopted unanimously in *Klein* v. *Maravelas, supra,* 219 N. Y. 383, 387.) Following this guide, our courts have limited the reach of this statutory provision to cases involving the sale of substantially an entire inventory or business. (See, e.g., *Mott* v. *Reeves, supra,* 125 Misc. 511, affd. 217 App. Div. 718, affd. 246 N. Y. 567; *Bimberg & Co.* v. *Unity Coat & Apron Co.,* 150 Misc. 836, affd. 244 App. Div. 777; *Texas Co.* v. *Drexelius,* 176 Misc. 371; see, also, *New York Credit Men's Assn.* v. *Domestic Broadtail Producers,* 61 F. Supp. 102, 105.) Similarly, in other jurisdictions, bulk

sales legislation has been applied only to transactions " uniquely extraordinary and out of the usual course of * * * a merchant's business " (*First Nat. Bank of Shreveport, La., v. Sharp,* 54 F. 2d 886, 888) — such as sales " discontinuing * * * business at * * * [the] old store " (*Cohen* v. *Calhoun,* 168 Miss. 34, 39) or closing out one link in a chain of stores (*Keller* v. *Fowler Bros. & Cox,* 148 Tenn. 571, 576), one branch of a business (*Conquest* v. *Atkins,* 123 Me. 327, 328), one line of wares (*Irving Trust Co.* v. *Rosenwasser,* 5 F. Supp. 1016) or an " entire stock of merchandise " (*Tupper* v. *Barrett,* 233 Mass. 565, 569; see, also, *Vacuum Oil Co.* v. *Wichita Ind. Consolidated Companies,* 110 Kan. 245, 246; *Fitz Henry* v. *Munter,* 33 Wash. 629, 630.)

It thus becomes evident that the statute was never designed to cover the sort of sale effected by Fink to Rubenstein. Its application depends " essentially * * * upon the nature of the seller's business * * * [and the] ordinary method of making sales ". (*Hart* v. *Brierley,* 189 Mass. 598, 601; see, also, *Markwell & Co.* v. *Lynch,* 114 F. 2d 373, 374–376.) The record here shows that in the business of shoe retailing the sale of " off-season " wares is no rare and irregular occurrence, but rather an established operating pattern, no attempt to defraud creditors, but rather an inevitable incident to the conduct of business. Shoe styles may vary sharply from season to season and year to year, with the result that last year's " rage " may clog this season's shelves. As seasons change, a merchant seeks to clear his store, and as rapidly as possible, of shoes still unsold. Larger stores may resort to much publicized " clearance sales " or operate their own " special outlet " stores. But the smaller, independent retailer, lacking the means for extensive advertising or a separate store, must, of necessity, rely on dealers specializing in unseasonable obsolete shoes. Thus, as the record reveals, Rubenstein alone regularly dealt with as many as " several hundred " retailers in " smaller towns * * * throughout northern and western New York ".

Such recurring sales, vital as these may be to the operation of the smaller independent retailer, must be regarded, in the words of the statute, as sales made " in the ordinary course of trade and in the regular prosecution of said business ". Indeed, to

subject such transactions to the requirements prescribed by section 44 would tell creditors little more than they already know. They are forewarned, by industry and trade custom, that " off-season " sales are regular occurrences and, entirely apart from the Bulk Sales Act, they may anticipate usual sales of obsolete leftovers and scrutinize such transactions beforehand. And, if fraud or covert advantage is later unearthed, a creditor may set it aside as a fraudulent conveyance under state law (N. Y. Debtor and Creditor Law, § 276) or as a preference or fraudulent conveyance under federal statute (Bankruptcy Act, § 3, subd. a, pars. [1], [2]; § 60, subd. b; § 67; U. S. Code, tit. 11, § 21, subd. [a], pars. [1], [2]; § 96, subd. [b]; § 107).

In point of fact, to hold that these frequently repeated transactions are controlled by section 44 might, contrary to the aim of the statute, render the creditor's lot more hazardous. Even if a dealer could be found to purchase " off-season " stock on the terms prescribed by the statute, the prices realized would almost certainly be lower. Small retailers might, therefore, be forced to rely upon markdown sales or below-cost clearances — which, as one expert testified at the trial, " would " make it " difficult * * * to sell the same customers other shoes at the list price ". The result, it is easy to see, might well be to curtail the retailer's business and thus endanger prompt payment to his creditors.

Of the three cases relied upon by the trustee to support his position (*Jubas* v. *Sampsell*, 185 F. 2d 333; *Irving Trust Co.* v. *Rosenwasser, supra*, 5 F. Supp. 1016; *Conquest* v. *Atkins, supra*, 123 Me. 327; see, also, *Markwell & Co.* v. *Lynch, supra*, 114 F. 2d 373), two are distinguishable on their facts,[2] and the third (*Jubas* v. *Sampsell, supra*, 185 F. 2d 333) arose under a California statute which, unlike our statute, adopts the explicit criterion whether the sale was made " in the regular and usual practice and method of business of the vendor " (Cal. Civ. Code [Deering Supp., 1951], § 3440.1, formerly § 3440). But,

2. *Conquest* v. *Atkins* (*supra*, 123 Me. 327), and *Irving Trust Co.* v. *Rosenwasser* (*supra*, 5 F. Supp. 1016), involved, not the routine and recurring disposal of scattered leftovers as in the case before us, but " the closing out of [the] business " (123 Me., p. 329) or the " close out " of a line of merchandise (5 F. Supp., p. 1017.)

distinguishable or not, reason and a regard for the practices prevalent in the retail shoe business — as reflected by the record before us — prompt rejection of the arbitrary and inflexible rule that would invalidate this sale. We cannot ignore the usages and necessities of modern retailing, by holding that only those sales made to customers off the street are in the ordinary course of trade or the regular prosecution of business.

The judgment should be reversed and the judgment entered upon the decision of the Official Referee dismissing the complaint, affirmed, with costs in this court and in the Appellate Division.

DESMOND, J. (dissenting). I think the Appellate Division was right in holding that, on the facts and the law, this bulk sale was not " in the ordinary course of trade ", and so was subject to the Bulk Sales Act. This vendor was not a wholesaler but the proprietor of a small retail shoe shop. His " ordinary course of trade " was the selling of shoes at retail, one or two pairs at a time, for personal use by his customers. His sale and delivery, in a quick cash transaction to one buyer, of about thirteen hundred pairs out of his comparatively small stock was just the sort of thing this statute deals with. When a retail merchant makes a bulk sale of the whole, or a substantial part, of his stock, the impact of the Bulk Sales Act is automatic (see *Mott* v. *Reeves,* 125 Misc. 511, affd. 217 App. Div. 718, affd. 246 N. Y. 567). It cannot make any difference that this particular sale was nonfraudulent (see *Mott* v. *Reeves, supra*), or that it was of a kind that has become common among retail shoe merchants. The statute was enacted because of similar practices that had become all too common, and — to prevent or penalize the fraudulently motivated ones — advance notice to creditors, of all such sales, was prescribed. An affirmance here would not abolish any commercially necessary method of closing out old stocks — it would merely call attention to the necessity of complying with the statute, as to such bulk sales.

Applying an almost identical statute to a similar sale, by a retailer, of out-of-style shoes, a Federal court wrote this:

" The ' regular and usual practice and method of business of the vendor ' cannot be measured by a prevalent custom of merchants which the vendor followed. The vendors herein were

retail shoe merchants whose regular and usual practice and method of business was selling shoes to those who came into the store to buy from the stock in trade for wear.

"The plain meaning of the statute is that when a storekeeper disposes of a substantial part of his stock in trade in bulk, and selling in bulk sales is not the usual and ordinary way in which he conducts his business from day to day, the sale falls within the statute." (*Jubas* v. *Sampsell,* 185 F. 2d 333, 334.)

The judgment should be affirmed, with costs.

LOUGHRAN, Ch. J., LEWIS, CONWAY and FROESSEL, JJ., concur with FULD, J.; DESMOND, J., dissents in opinion in which DYE, J., concurs.

Ordered accordingly.