Fuchsberg, J.
(dissenting). In my view, the majority’s resolution of this case offends important policies articulated in the Uniform Commercial Code and, in particular, cannot be reconciled with our recent application of the code in Tanbro Fabrics Corp. v Deering Milliken (39 NY2d 632). The statutory provisions at stake, their stability vital to the commercial life of State and Nation, are sections 9-102, 9-104 and 9-307 of the Uniform Commercial Code (Bunn, Snead & Speidel, An Introduction to the Uniform Commercial Code, p 4).
The operative facts are neither novel nor controverted. Indeed, for the most part they are stipulated. And, for all practical purpose, they mirror those in Tanbro.
The business of the plaintiff, J. Manes Co. (Manes), a textile converter, is to purchase fabric in undyed (greige) condition, finish it and then sell it to the trade in the state to which it has thus been converted. In November, 1969, in the regular course of its business, through a broker it purchased some 225,000 yards of greige goods from Mill Fabrics, Inc. (Mill), another converter which in turn, had purchased the material from the defendant, Greenwood Mills, Inc. (Greenwood), a manufacturer of greige goods. Mill had made the original purchase on an open account contract, which gave Greenwood a so-called “security interest” in the fabric to the extent of Mill’s running indebtedness. Mill’s purchase from Greenwood having been made on a “bill and hold” basis, in keeping with trade practice the goods were to be kept in Greenwood’s warehouse subject at any time to shipping instructions which might emanate from the purchaser. It was while the goods were so held that Mill, on December 1, 1969, sold them to Manes for $50,979, thereby transferring the former’s right and title to the goods under the bill and hold arrangement.
*763 Little more than a month had gone by when, in January, 1970, Mill became insolvent. It was subsequent to the insolvency, but while what were now Manes’ goods were still in Greenwood’s warehouse, that the new owner issued its shipping instructions. Greenwood thereupon refused to release the goods and, by letter dated March 2, 1970, notified Manes that it intended to dispose of the goods to offset a balance still due on its account with Mill. True to this statement, it sold them to a third party. On these facts, Special Term denied cross motions for summary judgment in an action brought by Manes for money had and received grounded on the theory that Greenwood had been unjustly enriched by the avails of Manes’ goods.[1] The Appellate Division has since affirmed. Only the plaintiff appeals.
These facts in mind, the Tanbro case is more than instructive. There, Tanbro, a textile converter, also purchased greige goods from Mill, which had originally purchased that fabric from another manufacturer, Deering Milliken, on the same type of open account basis under which Mill financed its purchases from Greenwood in the case before us now. As here too, the goods, in accordance with the bill and hold practice, were kept on the manufacturer’s premises to await the purchaser’s shipping instructions. When, in January, 1970, Tanbro gave such instructions, Deering Milliken, reacting to the self-same distressed financial condition of Mill, refused to deliver and, instead, sold the merchandise to a third party.
On appeal of Tanbro’s action for tortious conversion, we identified the issue to be whether the plaintiff’s “purchase of the goods was in the ordinary course of Mill Fabrics’ business, and hence free of [defendant manufacturer] Deering’s perfected security interest” (Tanbro Fabrics Corp. v Deering Milliken, 39 NY2d 632, 634, supra). Crucial to our answer was section 9-307 of the Uniform Commercial Code (entitled Protection of Buyers of Goods), subdivision (1) of which provides that “A buyer in ordinary course of business (subsection [9] of section 1-201) * * * takes free of a security interest created by his seller even *764 though the security interest is perfected and even though the buyer knows of its existence.” Noting it was Mill’s “predominant” business to finish goods before reselling the greige fabric it purchased from manufacturers, we nonetheless recognized that lateral sales of unfinished goods between converters constituted a normal, if less common, feature of a converter’s operation. We went on to hold that the manufacturer could not assert its security interest against Tan-bro, the purchaser to whom Mill passed title and to whom, in consequence, he was found liable for conversion (Tanbro Fabrics Corp. v Deering Milliken, supra, at pp 634-635, 637).
Yet, in the face of the two cases’ apparent sameness, Special Term in the case now on appeal chose to distinguish •them on the rationale that, because the Statute of Limitations relegated. Manes to an action sounding in quasi contract to recover for Greenwood’s unjust enrichment, the Uniform Commercial Code policy goals to which we gave effect in Tanbro do not count here. To take such a stance, it had to assume that Tanbro rested on an awareness that “the practice of storing goods at the seller’s mill is efficient and beneficial to the industry, and that the procedure would be put in jeopardy” unless the interest of a purchaser like Tanbro (or Mill) is subordinate to the manufacturer’s security interest. To that end, it would have required that Manes show that, “by agreement between defendant and Mill or by commonly accepted accounting principles”, one or more payments passing from Mill to Greenwood' in their running account were allocated to the specific good Manes brought.
In fact, however, neither the underlying commercial reality nor the dominant purpose of the Legislature in adopting the code is anywhere made so utterly dependent on whether a pleader frames a complaint on one theory or another. Rather, the fluidity of commercial transactions so essential to the marketplace would appear to insulate one in Manes’ position from the purported enforcement of Greenwood’s security interest in the goods resold to Manes by Mill. This is epitomized by article 9, which, by its terms, applies “to any transaction (regardless of its form) which is intended to create a security interest in personal property *765 or fixtures including goods” (Uniform Commercial Code, § 9-102, subd [1], par [a]; for enumerated exceptions see § 9-104; see, also, Henson, Secured Transactions under the Uniform Commercial Code, p 15 [1979]). It, therefore, would be incongruous to call upon Manes to demonstrate the satisfaction of a security interest to which it was not subject under the code in any event.
More, it would be both unfair and impractical to somehow make Manes responsible for accounting arrangements to which it cannot have been privy, since these reflected transactions between its seller and its seller’s supplier alone, and over which Manes had absolutely no control. In Tanbro, there was some evidence that the moneys passing from Mill to Deering had in fact been earmarked to cover the good involved. But, we there gave no weight to this factor. While we acknowledged that the open account gave Deering a security interest in all goods purchased from it by Mill, under section 9-307 Deering was precluded from enforcing it against Tanbro. This was not because the court questioned the force of the manufacturer’s security lien as against Mill, but because, applying this section, we determined that the security interest did not reach to Mill’s purchaser. In like manner, in the present case the statute should not allow Greenwood’s security interest coloration to legitimatize its appropriation of the goods Manes had purchased from Mill in good faith and in due course at an open market, not distressed, sales price.
Nor is there an issue in this case as to whether, in December, 1969, when it sent Mill its check for the purchase price, Manes had knowledge of Greenwood’s security interest. The kind of knowledge that could render a purchaser vulnerable is not knowledge of the existence of the security agreement but of some violation of the agreement inherent in the purchase (see Uniform Commercial Code, § 1-201, subd [9]). Here, not only is no such knowledge alleged, but Manes had no actual notice of the seller’s security interest at all. Thus, Manes’ purchase from Mill was precisely the kind of transaction section 9-307 of the Uniform Commercial Code was intended to facilitate.
In a case so structured, the majority falls back to the position that because Mill was in the business of converting *766 greige goods, rather than selling them as such, Manes was not a purchaser who had bought the goods from one who was in the “business of selling” them within the compass of subdivision (9) of section 1-201 and subdivision (1) of section 9-307 of the Uniform Commercial Code. Before mounting this argument, it “notes” that Mill was the one who had sold the same kind of goods at about the same time and under the precisely same circumstances to the plaintiff in Tanbro and the plaintiff here.
Then, to avoid the implications of the unavoidable, it asserts that in Tanbro our decision that Mill was “in the business of selling” greige goods was premised on a purportedly affirmed factual finding in the courts below. But at best this tells only half the story. There indeed had been such a finding and we had no problem in going along with that. But, our affirmance did not depend on it. The undisputed fact, was that Mill’s sale to Tanbro, as was the one here to Manes, was a resale of preconverted greige goods, rather than postconverted greige goods. Neither sale, the one to Manes no more and no less than the one to Tanbro, represented a “predominant business purpose”. Nevertheless, terming such a sale a reasonably anticipatable “business advantage”, we unanimously determined, dehors any question of fact, that “on an alternative analysis, such a sale by Mill Fabrics was * * * impliedly authorized under the code”. This was, we said, because “all subdivision (1) of section 9-307 requires is that the sale be of the variety reasonably to be expected in the regular course of an ongoing business” (Tanbro Fabrics Corp. v Deering Milliken, 39 NY2d 632, 637, supra). Whatever may be thought to have been the basis for any other'“alternative analysis”, clearly this one was made on the law.[2]
Finally, we should point out that the two “industry experts” Greenwood produced added nothing to the facts. What they had to say was simply that sellers sell and converters convert. On this everybody agrees. Whether a sale *767 made by a converter for a purpose “only incidental to [its] predominant business purpose” comes within the embrace of the pertinent Uniform Commercial Code section is a question of law, not fact, and on that their offerings were simply worthless. How this question of law was to be answered was for us, and we did so directly when we held that such an “incidental” sale was “of the variety reasonably to be expected of an on-going, business” under the code (cf. Sternberg v Rubenstein, 305 NY 235, 238, 240-242).
For these reasons, I believe the order of the Appellate Division should be reversed and the motion for summary judgment granted. Consonantly, the certified question should be answered in the negative.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur; Judge Fuchsberg dissents and votes to reverse in an opinion.
Order affirmed, with costs, and question certified answered in the affirmative in a memorandum.

. The statutory period within which a conversion action could be brought had expired.

. In Tanbro, Trial Term had directed a verdict for liability as a matter of law, sending only the damage issue to the jury, a course which the Appellate Division apparently agreed was the correct one, since in that court, only the single dissenter, without delineating any rationale, thought there was a question of fact on whether Mill’s sale was within the statute (48 AD2d 784).