In the Matter of CURTINA INTERNA-
TIONAL, INC., Debtor.

Brian S. MURDOCK, Trustee in
Bankruptcy, Plaintiff,

v.

PLYMOUTH ENTERPRISES,
INC., Defendant.

Bankruptcy No. 81 B 20208.
82 Adv. 6091.

United States Bankruptcy Court,
S.D. New York.

Oct. 21, 1982.

Brian S. Murdock, White Plains, N.Y., trustee in bankruptcy.

Reid & Priest, New York City, for trustee in bankruptcy.

Weinstein & DeZorett, Garden City, N.Y., for Plymouth Enterprises, Inc.

TRUSTEE'S ACTION TO AVOID SALE AS CONSTRUCTIVELY FRAUDULENT TRANSFER AND VIOLATION OF BULK SALES LAW.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor's sale of 6319 cases of imported vanilla, raspberry and orange wafers to the defendant, a closeout specialist of confectionery items, shortly before the debtor was involuntarily thrown into Chapter 7 of the Bankruptcy Code is the basis for this adversary proceeding commenced by the trustee in bankruptcy who seeks to avoid the sale either as a constructively fraudulent transfer or as a violation of the state bulk sales law. The defendant asserts the statute of limitations as a procedural defense to the bulk sales charge. Additionally, the defendant contends that it gave fair consideration to the debtor in an armslength transaction for the merchandise and that the circumstances of the sale were beyond the pale of the state bulk sales law.

It appears that the wafers constituted the debtor's entire inventory at the time of the sale. However, the defendant claims that it did not know that the debtor handled no other merchandise lines. Moreover, the defendant says that raspberry and orange wafers are not big sellers in this country and that most wafer eaters prefer vanilla fillings. The debtor refused to sell its vanilla wafers only. Therefore, the defendant had to accept the raspberry and orange filled wafers in order to purchase the debtor's vanilla wafers.

### FINDINGS OF FACT

1. Plaintiff, Brian S. Murdock, is the trustee in bankruptcy of Curtina International, Inc. On April 3, 1981, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed in this court against Curtina. On April 24, 1981 an order for relief was entered against the debtor. The plaintiff was appointed trustee in bankruptcy on April 28, 1981.

2. The debtor, Curtina, had been engaged since late 1979 in the business of importing and distributing confectionery products, mainly consisting of varieties of wafers manufactured by Walde Tirol Ges. m.b.h. and also by Candita Suessenfabrek. Both manufacturers are located in Austria.

3. The defendant, Plymouth Enterprises, Inc. is a corporation organized under the laws of the State of New York and is engaged in the business of buying and selling close-outs, namely excess inventory, out-of-season inventory, discontinued items, old inventory, etc. from manufacturers and wholesalers at a fraction of their normal selling prices.

4. The debtor's books and records reflect that from its inception its confectionery importing business was not financially successful. Its first partial year of operations in 1980 resulted in a deficit of $65,640. For the period between January, 1981 and the end of March, 1981, the debtor sustained a deficit of $214,079. Moreover, the plaintiff has established from the debtor's books and records that during the months of February and March, 1981, the period in question, the debtor was insolvent.

5. According to the debtor's schedules, its largest unsecured creditor (approximately 97%) is Walde Tirol Ges.m.b.h., the debtor's supplier of Walde wafers. Walde was an unsecured creditor in February and March of 1981, the period in question.

6. In February, 1981, the debtor, through its president, approached the defendant, Plymouth, and offered to sell the latter the debtor's line of vanilla wafers. The defendant's president was shown a sample box of the wafers which he described as not fresh, but saleable. Defendant's president testified without contradiction that he was not aware at that time that wafers comprised the debtor's entire inventory; he did not then know whether or not the debtor carried other merchandise lines as well.

7. After some negotiations the parties agreed upon a price for the vanilla wafers with the result that on February 24, 1981, the debtor sold to the defendant 673 cases of Walde vanilla wafers at $19.44 per case. Thereafter, in March, 1981, the parties negotiated for a second sale. The defendant desired to buy vanilla wafers only. However, the debtor insisted on including raspberry and orange wafers in addition to the desired vanilla wafers. The defendant's president testified that he did not want the raspberry and orange wafers at any price because they were not desirable flavors in this country. Therefore, the parties negotiated a price whereby the defendant would purchase the raspberry and orange wafers as well as the vanilla wafers and still make a profit.

8. On March 20, 1981, the debtor sold to the defendant 4,734 cases of vanilla, raspberry and orange Walde wafers at $11.52 per case and 912 cases of Candita wafers at $12.96 per case. These sales consisted of substantially all of the debtor's inventory.

9. At no time did the defendant require the debtor to furnish a list of its existing creditors nor did the defendant furnish notice of the sales to such creditors.

10. According to the debtor's books and records, its normal selling price for the wafers in question ranged from $49.11 to $54.36 per case. It had previously sold 4500 cases to F.W. Woolworth & Co. in February and March of the previous year for $49.00 per case. The debtor's average cost for the Walde wafers was approximately $32.00 per case. It also sustained freight charges that averaged about $6.00 per case.

11. The debtor's records also reflect that it usually incurred certain expenses in the course of its normal sales, such as freight allowances, brokerage commissions, advertising allowances and credits for returns of merchandise. However, none of these expenses was incurred in connection with the sale to the defendant.

12. The sales to the defendant differed from the debtor's usual sales pattern in that only one delivery location was involved rather than numerous stores, as in the sales to F.W. Woolworth & Co. The defendant paid for the freight from the debtor's location to a public warehouse as well as the freight charges from the public warehouse. The defendant paid for the insurance while the merchandise was stored at the warehouse and the brokerage commissions incurred in merchandising the wafers. Moreover, the defendant purchased the wafers on the condition that there would be no charges to the debtor for any returned merchandise.

13. The invoiced price of the wafers totalled $75,291.12. After a credit was given for shortages and damaged goods, the full payment of $66,766.32 was made by the defendant.

14. Although the defendant was able to resell the wafers at a profit, it took the defendant approximately nine months to dispose of all of the merchandise. According to the defendant's uncontradicted testimony the shelf life of confectionery items for close-out is normally one month because they are perishable, subject to seasonal conditions and they deteriorate in taste with the passage of time. Thus, a disposal period of nine months was an unusually long time for a close-out specialist to tie up $66,766.32 in inventory, because he usually buys and sells other people's mistakes during brief intervals and at low prices.

15. The deposition of the debtor's president that was introduced into evidence reveals that the Walde wafers were not fresh. Indeed, he said that he would not eat them because they were "pretty old." It also appears that the debtor's president contacted many large customers in the hope that he could dispose of what he termed "almost distressed merchandise." The debtor's president also notified Walde, the supplier of the wafers and the debtor's largest creditor, that the debtor intended to sell its wafer inventory to the defendant, a close-out specialist.

16. The defendant's president testified that when the debtor approached him with the offer to sell the wafers in question, the defendant had no knowledge or reason to believe that the debtor was going out of business.

17. The evidence also reveals that the debtor attempted to sell the wafers to other close-out specialists without success. A sale to a close-out specialist does not necessarily signify that the vendor is about to go out of business. Vendors may sell for reasons other than going out of business, such as an excess of enthusiasm for the merchandise not reflected in sales, out-of-season items, overproduction of inventory, tightness of money and a desire to sell the entire line for close-out purposes without concern for customer returns. The close-out specialists dispose of the merchandise through sources other than the vendor's normal channels of distribution, thereby avoiding competition with the vendor's non-closeout products.

18. In this case, it appears that vanilla wafers usually sell best during the approaching cool seasons. The wafers in question were sold in February and March, just before the warm weather season; not at the most propitious time for an importer to carry a large inventory of not-too-fresh vanilla, raspberry and orange wafers.

19. Based upon the debtor's unsuccessful efforts to dispose of its not-too-fresh wafer inventory, the sale to the defendant of all the debtor's vanilla, raspberry and orange Walde and Condita wafers (brand names not well known in this country) for a net price of $66,766.32, represents the best price that a willing close-out confectionery specialist would pay and what the debtor would accept in an arms-length transaction. Therefore, what the defendant paid and what the debtor received for the debtor's entire line of wafers constituted fair and reasonable consideration and a reasonably equivalent value under the circumstances that existed at the time of the sale.

## FRAUDULENT TRANSFER

The plaintiff trustee does not suggest that the debtor sold its wafers to the defendant with any actual intent to hinder, delay or defraud its creditors, as proscribed under 11 U.S.C. § 548(a)(1). Instead, the trustee seeks to avoid the sale as a constructively fraudulent transfer, where actual intent need not be established, as described in 11 U.S.C. § 548(a)(2)(A), and (B)(i),[1] as long as the following four elements are proven:

1. There was a transfer of an interest of the debtor in property;

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

---

1. § 548. *Fraudulent transfers and obligations.*
    (a) the Trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—
    .    .    .    .    .

2. The transfer occurred on or within one year of the filing of the petition;

3. The debtor was insolvent on the date that the transfer was made or became insolvent as a result thereof;

4. The debtor received less than a reasonably equivalent value in exchange for such transfer.

Section 273 of the New York Debtor and Creditor Law is to the same effect.[2]

▮▮▮ The existence of the first three elements is not questioned in this case. Hence, the issue for determination is whether or not the debtor received less than a reasonably equivalent value in exchange for the transfer. The trustee bears the burden of establishing what a reasonably equivalent price for a given transaction should be and must then establish that the consideration given by the defendant did not approximate this figure. *In re Newman,* 11 B.R. 628 (Bkrtcy.S.D.N.Y.1981) aff'd, 15 B.R. 658 (S.D.N.Y.1981). There is no precise formula to ascertain what constitutes a reasonably equivalent value; the court as the trier of the facts must determine this issue under all of the facts and circumstances of the case. *Roth v. Fabrikant Bros.,* 175 F.2d 665 (2d Cir.1949); *Klein v. Tabatchnick,* 610 F.2d 1043 (2d Cir.1979); *Rosenberg v. Trautwein,* 624 F.2d 666 (5th Cir.1980).

The term "fair consideration" is defined under Section 272 of the New York Debtor and Creditor Law as follows:

"§ 272. Fair consideration

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as

compared with the value of the property, or obligation obtained."

This definition will also satisfy the requirement under 11 U.S.C. § 548(a)(2)(A) that the debtor must receive a "reasonably equivalent value." Reasonably equivalent is similar to the former "fair equivalent" under Section 67(d)(1) of the former Bankruptcy Act, although the term has a broader application. *Matter of Hemphill,* 18 B.R. 38, 48 (Bkrtcy.S.D.Iowa 1982).

This case does not involve the usual scenario of a transfer in payment of an antecedent debt of lesser value. See *Kindom Uranium Corp. v. Vance,* 269 F.2d 104 (10th Cir.1959); *Wilson v. Robinson,* 83 F.2d 397 (2d Cir.1936). Nor does this case present the classical fact pattern where a transfer is presumed to be a fraud upon the creditors of an estate because it is a transfer to an insider or a relative for questionable consideration. See *James Hotel Company v. Oklahoma Bar Company,* 464 F.2d 1199 (10th Cir.1972); *Schafer v. Hammond,* 456 F.2d 15 (10th Cir.1972); *Conad Duberstein v. Werner,* 256 F.Supp. 515 (E.D.N.Y.1966). Nor was the transfer made to another creditor whose previous dealings with the debtor motivated the disputed transfer. See *Roth v. Fabrikant Bros., supra; Klein v. Tabatchnick, supra; In re Ferris,* 415 F.Supp. 33 (W.D.Okl.1976). Moreover, this case does not involve the granting of a mortgage or secured interest in the property of the debtor. See *Davis v. Hudson Trust Co.,* 28 F.2d 740 (3rd Cir.1928), *cert. denied,* 278 U.S. 655, 49 S.Ct. 179, 73 L.Ed. 565 (1928); *Conrad Duberstein v. Werner, supra.* Nor is there in question a purchase for allegedly insufficient consideration at a mortgage foreclosure sale. See *Durrett v. Washington National Insurance Co.,* 621 F.2d 201 (5th Cir.1980); *Abramson v. Lakewood Bank and Trust Co.,* 647 F.2d 547 (5th Cir.1981). But see *Lawyers Title Insurance Corp. and Donld Turney v. Madrid,* 21 B.R. 424, 9 B.C.D. 256 (Bkrtcy.App. 9th Cir.1982).

---

**2.** § 273. *Conveyances by insolvent*

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors

without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

What is involved here is a straight arms-length non-collusive sale for consideration determined by what a close-out specialist was willing to pay for the debtor's line of wafers after unsuccessful efforts by the debtor to dispose of the not-too-fresh wafers by selling them to other potential purchasers of distressed merchandise. Had the debtor not been able to sell the wafers before the involuntary Chapter 7 petition was commenced, several more weeks would have elapsed before the trustee in bankruptcy would have had to attempt to liquidate the inventory of perishable wafers with a shelf life that was steadily deteriorating. It took the defendant, a confectionery close-out specialist, nine months to dispose of all the wafers, during which time the defendant incurred expenses and lost the use of the $66,766.32 in cash that it paid for the entire line. Perhaps the debtor's sale in the close-out market was the best possible price that could be obtained for the perishable merchandise with the result that the trustee, after his appointment, was not left with the not-too-fresh cream-filled wafers for disposal at an even later date and in the face of the approaching off-season warm weather. In short, the parties received what they bargained for; the debtor unloaded its perishable inventory in an arms-length transaction while the defendant obtained the inventory, as is. As stated in *Harper v. Lloyd's Factors,* 214 F.2d 662, 664 (2d Cir.1954): "[T]here was no overreaching of the bankrupt or defrauding of his estate to the creditors' loss."

■ Accordingly, it cannot be concluded that the plaintiff has established that the debtor received less than a reasonably equivalent value in exchange for the transferred inventory so that the defendant should be liable to the trustee for having received a constructively fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(2)(A) or under Sections 272, 273 or 274 of the New York Debtor and Creditor Law.

## STATUTE OF LIMITATIONS—TOLLING FOR BULK SALES CLAIMS

■ The defendant notes that the last delivery to it of the wafers purchased from the debtor took place in March of 1981, fifteen months before the trustee in bankruptcy commenced this adversary proceeding on June 8, 1982. Therefore, the defendant contends that the bulk sales action is time-barred by the six-month limitation period provided in Section 6–111 of the Uniform Commercial Code, as adopted in New York.[3] However, the order for relief was entered on April 24, 1981, within the six-month period. The defendant maintains that there is no tolling privilege available to the trustee in bankruptcy because 11 U.S.C. § 546, which refers to the limitations on the trustee's avoiding powers, does not reincorporate the two-year period that previously applied under § 29(e) of the former Bankruptcy Act of 1898.

The defendant's reference to 11 U.S.C. § 546 is misdirected. The tolling provisions under the present Bankruptcy Code are to be found in 11 U.S.C. § 108. Thus, if the debtor has six months under applicable law to commence an action under the state bulk sales law, and an order for relief is entered against the debtor before the expiration of the six months, the trustee in bankruptcy is afforded a tolling privilege of two years after the order for relief in which to commence such action.[4] Hence, the defendant's defense based upon a six month statute of limitations is without merit.

---

3. § 6–111. *Limitation of Actions and Levies*
No action under this Article shall be brought nor levy made more than six months after the date on which the transferee took possession of the goods unless the transfer has been concealed. If the transfer has been concealed, actions may be brought or levies made within six months after its discovery.

4. § 108. *Extension of time.*

(a) If applicable law, an order entered in a proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—

. . . . . .

.(2) two years after the order for relief.

## BULK TRANSFER

According to the schedules filed in this case, the debtor's major supplier, Walde, was an unsecured creditor at the time that the debtor sold its entire wafer inventory to the defendant in February and March of 1981. Pursuant to 11 U.S.C. § 544(b), the trustee in bankruptcy is entitled to step into the shoes of an actual unsecured creditor, such as Walde, in order to assert any right that such creditor might have for avoiding a transfer by the debtor under applicable law, usually state bulk sales laws. This section is consistent with the holding in *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931) and provides:

"544. *Trustee as lien creditor and as successor to certain creditors and purchasers.*

. . . . .

(b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

Under Article 6 of the New York Uniform Commercial Code, referred to as the "Bulk Transfer Article", a creditor of a bulk transferor may look to Sections 6–104 and 6–105 for purposes of avoiding a transfer that fails to comply with the notice requirements of the Bulk Transfer Article.

Section 6–104 provides:

"§ 6–104. *Schedule of Property; List of Creditors*

(1) Except as provided with respect to auction sales (Section 6–108), a bulk transfer subject to this Article is ineffective against any creditor of the transferor unless:

(a) The transferee requires the transferor to furnish a list of his existing creditors prepared as stated in this section; and

(b) The parties prepare a schedule of the property transferred sufficient to identify it; and

(c) The transferee preserves the list and schedule for six months next following the transfer and permits inspection of either or both and copying therefrom at all reasonable hours by any creditor of the transferor, or files the list and schedule in the department of state.

(2) The list of creditors must be signed and sworn to or affirmed by the transferor or his agent. It must contain the names and business addresses of all creditors of the transferor, with the amounts when known, and also the names of all persons who are known to the transferor to assert claims against him even though such claims are disputed. If the transferor is the obligor of an outstanding issue of bonds, debentures or the like as to which there is an indenture trustee, the list of creditors need include only the name and address of the indenture trustee and the aggregate outstanding principal amount of issue.

(3) Responsibility for the completeness and accuracy of the list of creditors rests on the transferor, and the transfer is not rendered ineffective by errors or omissions therein unless the transferee is shown to have had knowledge."

Section 6–105 provides:

"§ 6–105. *Notice to Creditors*

In addition to the requirements of the preceding section, any bulk transfer subject to this Article except one made by auction sale (Section 6–108) is ineffective against any creditor of the transferor unless at least ten days before he takes possession of the goods or pays for them, whichever happens first, the transferee gives notice of the transfer in the manner and to the persons hereafter provided (Section 6–107)."

There is no question that the defendant did not give the prescribed notice or otherwise comply with the Bulk Sales Article. The defendant maintains that the transaction in question was not a bulk transfer. A bulk transfer is defined under Section 6–102(1) of the New York Uniform Commercial Code as;

"any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the materials, supplies, merchandise or other inventory (Section 9–109) of an enterprise subject to this Article."

It is undisputed that the debtor sold all of its inventory of wafers to the defendant. Therefore, in order to avoid the debtor's sale to the defendant, the plaintiff must establish that the transfer was not in the ordinary course of the debtor's business. Consideration must therefore be given to the nature of the debtor's business and the manner in which it sold its merchandise. Evidence that the debtor had similar transactions in the past and that such transfers were common practice in the trade would be indicative that the questioned transfer occurred in the ordinary course of the debtor's business. Thus, the New York Court of Appeals in *Sternberg v. Rubenstein,* 305 N.Y. 235, 112 N.E.2d 210 (1953) ruled that the sale of off-season shoes, the type of merchandise that was rendered "obsolete" by the passage of time, was exempt from the New York Bulk Sales Act. The New York Court of Appeals observed that the sale of obsolete inventory was an inevitable incident to the conduct of the transferor's business, provided that the sale did not constitute a discontinuance of a branch of business or a line of merchandise.

Similarly, in *Aab v. Loehmann's Inc.,* 8 B.R. 777 (Bkrtcy.S.D.N.Y.1981) the District Court held that a sale of out of season women's apparel was not a bulk sale even though the sale took place just prior to the filing of the debtor's voluntary petition in bankruptcy. The court relied on *Sternberg v. Rubenstein, supra,* and noted that the quantity of women's apparel purchased by the defendant was similar to that purchased by the defendant from the debtor in the past.

A transferee's failure to establish that the transferor periodically engaged in close-out sales can be fatal where the transferor was not engaged in the business of selling close-outs. Thus, in *Irving Trust Co. v. Rosenwasser,* 5 F.Supp. 1016 (S.D.N.Y.

1934), the District Court did not believe the debtor's testimony as to any previous semi-annual close-out sales that would justify the bulk sale of 5,000 pairs of shoes as a sale within the ordinary course of business of a debtor who was engaged in the selling at retail of ladies' shoes. The court said that the sale of close-outs "might have been an incident, and, no doubt, a convenient incident of their business—perhaps of any retail business—but it was not, properly speaking in the ordinary course of any retail trade or the regular prosecution of such retail business" (p. 1017). That the transferee is engaged in the close-out business is of no consequence, because a sophisticated close-out purchaser should be aware of the bulk sales law and seek protection by complying with its provisions. This point was expressed in *Irving Trust Co. v. Rosenwasser, supra,* at page 1017 as follows:

"[A]ny one who made a purchase of such 'close-outs' at such a sale was doing it at his own risk. The risk that he ran, of course, was that there might be a supervening insolvency or bankruptcy of his seller, and he would be called to account by the creditors of the latter. It would be perfectly possible for a purchaser in bulk to protect himself by complying with the provisions of section 44, [the predecessor Bulk Sales Act] so that the result is, as has been pointed out in some of the cases, that honest business is not interfered with by this statute, which merely made a provision, the intention of which was to do away with some sources of fraud on creditors which had long troubled the commercial community."

In short, a transferee who seeks to establish that a close-out sale was in the ordinary course of the transferor's business must establish three elements: (a) such sales were common practice in the transferor's industry or trade; (b) the transferor routinely disposed of leftovers in close-out sales; (c) "there was no discontinuance of any branch of [the transferor's] business nor of any line or brand of merchandise carried by [the transferor] . . . ." *Sternberg v. Rubenstein, supra,* 305 N.Y. at 237, 112 N.E.2d 210.

Other courts, interpreting a bulk sales provision similar to U.C.C. § 6–102 have flatly rejected close-out sales as an excluded normal business practice. In *Jubas v. Sampsell,* 185 F.2d 333 (9th Cir.1950) a retail shoes store sold 25% of the number of pairs of shoes in its inventory, amounting to 15% in value, for one dollar per pair to another dealer, and then voluntarily filed a petition in bankruptcy. The one dollar per pair was the best offer obtainable. The trustee in bankruptcy was able to set aside the sale as violative of the California bulk sales law, despite the transferee's claim that "unloading" unmarketable shoes in that manner was a normal business practice. The court held that:

"The plain meaning of the statute is that when a storekeeper disposes of a substantial part of his stock in trade in bulk, and selling in bulk sales is not the usual and ordinary way in which he conducts his business from day to day, the sale falls within the statute."

The *Jubas* case, *supra,* was quoted with approval in *Danning v. Daylin,* 488 F.2d 185 (9th Cir.1973), where the court noted (at page 190) that the transferee's good faith and the absence of fraudulent intent are no defenses to a violation of the bulk sales law. The reason for such strict liability was to discourage a merchant who owes debts, from selling out his stock in trade to anyone at any price, pocketing the proceeds and disappearing without paying his creditors. See *Sternberg v. Rubenstein,* 305 N.Y. at 239, 112 N.E.2d 210; *Reed v. Anglo-Scandinavian Corp.,* 298 F.Supp. 310, 313 (E.D.Cal. 1969).

In the instant case, the defendant has established that a close-out sale of the confectionery goods prior to total loss of shelf life is a common practice in the industry. However, there was no evidence that the debtor ever sold any portion of its line of wafers on a close-out basis since its inception in late 1979, and up to the time when it sold off all its inventory in March of 1981. Moreover, the transfer to the defendant resulted in the discontinuance of the debtor's entire business; it retained no other merchandise lines nor did it remain open as a going business. Several weeks later its major supplier and creditor, Walde, filed an involuntary petition against the debtor for relief under Chapter 7 of the Bankruptcy Act.

Based upon the foregoing, it is held that the plaintiff has established, and the defendant has failed to rebut, that the defendant purchased the debtor's entire inventory of vanilla, raspberry, and orange wafers without complying with the notice provisions in Sections 6–104 and 6–105 under Article 6 of the New York Uniform Commercial Code, referred to as the Bulk Transfer Article.

### DAMAGES

Article 6 of the New York Uniform Commercial Code imposes no specific remedy for failure to comply with the bulk sales law. Under § 6–104 and § 6–105 a non-complying transfer is "ineffective" against creditors of the transferor. The Official Comment suggests that an objecting creditor may levy on or obtain possession of the merchandise but is silent as to money damages, especially where the merchandise has been resold by the transferee. Thus, Comment number 2 following § 6–104 provides:

"2. Except for the accuracy of the list of creditors, the sanction for non-compliance with the present section is that the transfer is ineffective against creditors of the transferor. The creditors referred to are those holding claims based on transactions or events occuring before the transfer (Section 6–109). Any such creditor or creditors may therefore disregard the transfer and levy on the goods as still belonging to the transferor, or a receiver representing them can take them by whatever procedure the local law provides. But it follows also that if the debts of the transferor are paid as they mature disregard of the requirements of the section creates no liability. And a defect can always be cured by paying off the unpaid creditors."

Similarly, the Official Comment with respect to § 6–111 provides:

"2. The main sanction for noncompliance with the Article is that the transfer 'is ineffective against any creditor of the transferor.' Sections 6–104, 6–105. This means e.g., that a judgment creditor of the transferor may levy execution on the property. See Comment 2 to Section 6–104.

In such a case, which may be expected to be frequent, no 'action under this Article' will be necessary. The action will have been brought and prosecuted to judgment on whatever the claim was. The only thing done 'under this Article' will be the levy and resulting sale."

The New York cases interpreting the bulk sales law have held that a transfer in violation of the law obligates the transferee to account to the transferor's creditors for the value of the merchandise transferred. *Starr Piano Company et al. v. Sammak et al.,* 235 N.Y. 566, 139 N.E. 737 (1923); *In re Perman,* 172 App.Div. 14, 157 N.Y.S. 971 (1st Dept.1916); *In re P. Pastene & Co., Inc.,* 156 N.Y.S. 524 (Sup.Ct.N.Y.Co.1914). The court in *In re Pastene & Co., supra,* stated the rule as follows (page 525):

"The failure to comply with the statute renders the sale void, and the purchaser, instead of becoming the owner of the goods sold, on the complaint of any creditor shall be deemed to be, as a matter of law, a trustee for the creditors of the seller. As soon as the action is begun the purchaser is deemed to be a receiver, with the duty to account as trustee to the creditors pro rata for all the property sold to him in violation of the provisions of the statute."

See also *Irving Trust Co. v. Rosenwasser,* 5 F.Supp. 1016 (S.D.N.Y.1934). However, where the goods were resold, or otherwise disposed of, or intermingled with other merchandise of the transferee in such manner that the goods cannot be identified, the transferee, under such circumstances, will be liable to the creditors to the extent of the fair value of the goods disposed of or converted by the transferee. *Darby v. Ewing's Home Furnishings,* 278 F.Supp. 917 (W.D.Okl.1967); *Brod ex rel. Potash's Creditors et al. v. Supreme Dress Co.,* 243 App. Div. 622, 276 N.Y.S.2d 526 (App.Div. 2d Dept.1935). See also 37 *Am.Juris.*2d § 272, p. 925; 37 *C.J.S.* § 484, p. 1352; 47 *A.L.R.*3d p. 1142. Section 550 of the Bankruptcy Code similarly allows the trustee to recover the value of the property transferred.[5] Moreover, the transferee's liability is for the value of the assets on the date of the non-complying transfer and not the value at the time of a later resale; nor can such value be reduced by other expenditures of the transferee after the improper transfer. *In re Pritchard,* 8 B.R. 688, 692 (Bkrtcy.C.D. Cal.1981).

In the instant case, it has been found that the reasonable equivalent value of the vanilla, raspberry and orange wafers sold in bulk by the debtor to the defendant was $66,766.32 at the time of the sale. Accordingly, the defendant is liable to the debtor's estate and must account for this amount. However, the defendant has paid the full purchase price to the debtor, and the funds appear to have been deposited by the debtor in its account with the European American Bank, as reflected in the debtor's general ledger (Exhibit 3) and the accountant's compilation report (Exhibit 5). The debtor's schedules reveal a sum of $44,639.49 on deposit in its account with the European American Bank at the time the involuntary petition was filed. In accounting for the value of the inventory, the defendant is entitled to a credit for that portion of the proceeds from the sale that are traceable to the funds held by the plaintiff trustee in bankruptcy.

The defendant here acted in good faith and gave a reasonably equivalent value for

**5.** § 550. *Liability of transferee of avoided transfer.*

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, or 724(a) of this title, the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made;

the inventory. There was no fraudulent conveyance within the terms of Bankruptcy Code § 548. In this case, had the defendant transferee not paid sufficient consideration for the inventory, so that the transaction might then have been treated as constructively fraudulent under Code § 548(b), the defendant, as a good faith transferee for value, would have been permitted to assert a lien under Code § 548(c) to the extent of the value given to the debtor. However, Code § 548(c), in authorizing such a lien for value, expressly excludes lien protection with respect to voidable transfers under Code § 544, such as the bulk sales transfers that are voidable under Code § 544(b). As previously indicated, a bulk sale transferee's good faith is no defense and strict accountability for the inventory is imposed. See *Danning v. Daylin, supra.*

Moreover, had the transaction in this case been voidable as a fraudulent conveyance under Code § 548(b), it would still follow that "a transferee guilty of fraudulent behavior may nevertheless prove a claim against the bankrupt estate, once he returns the fraudulently conveyed property of the estate." *Misty Management Corp. v. Lockwood,* 539 F.2d 1205, 1214 (9th Cir. 1976). In that case the court opined that it would be inequitable to allow the estate to recover the voidable conveyance and also to retain whatever consideration it had been paid for such conveyance.

In this case, it would be inequitable to allow the trustee to retain a portion of the proceeds held by him that are traceable to the defendant's payment for the debtor's wafer inventory and, nevertheless, require the defendant to pay in full for the inventory a second time. If the defendant's obligation to account for the value of the inventory may be satisfied or reduced by crediting any funds traceable to the bulk sale which are now held by the trustee in his account, then the defendant's liability should be lim-

ited to the value of any unrecovered or unaccounted for proceeds.

The application of the traceable purchase proceeds held by the trustee is not by way of set off, where mutual debts arising out of separate transactions may be applied against one another. See, *In re Yonkers Hamilton Sanitarium, Inc.,* 22 B.R. 427, 432 (Bkrtcy.S.D.N.Y.1982). In the instant case, the traceable bulk sale funds held by the trustee would be applied for purposes of abatement or reduction of the trustee's claim against the defendant transferee for the transferred property. The trustee's claim arises out of the same bulk sale transaction in which the defendant paid the funds over to the debtor. It is the voiding of this transaction which gives rise to a claim by the defendant under Bankruptcy Code § 502(h) for the amount it may have to pay the trustee. Since both claims arise from the same transaction, there is conceptually no set off.

The instant case is similar to *In re Verco Industries,* 10 B.R. 347 (Bkrtcy.App. 9th Cir. 1981), where the court also declined to analyze the case within a set-off framework. In that case, the court held that the debtor's claim on a purchase note given by the transferee as part of the consideration for a bulk sale, could not be set off against the transferee's claim which arose against the debtor's estate pursuant to § 502(h) of the Bankruptcy Code after the trustee voided the bulk sale. The court reasoned that the debts were not mutual, in that although the defendant transferee was obligated to the debtor on the note, the debtor was not indebted to the transferee for anything.[6]

This court shares the *Verco* court's view that no set-off theory was involved, but for a different reason. The problem there was not a lack of mutuality. Rather, the claims both arose from the same transaction, which was the bulk sale. Therefore, just as

---

**6.** The dissent found fault with the majority's conclusion regarding the issue of set off. The dissent found that mutuality of debts existed, since the debtor's estate had a claim on the note against the transferee, while the transferee had a claim against the debtor's estate arising from the voided transfer. The dissent observed that the claim under § 502(h) would not be allowable, however, until the transferee surrendered the property from the voided sale or its value to the estate. [Code 502(d) ].

in the instant case, the transferee's claim should not be analyzed as a set off against the debtor's claim because there are no mutual debts arising out of separate transactions that can be applied against each other.

There is no evidence as to what portion of the trustee's funds, if any, may be traceable as proceeds from the voided bulk sale. Therefore, in order for the defendant to justify a reduction of its liability, it may seek a hearing to attempt to identify any portion of the proceeds held by the trustee that can be linked to the sale. The amount for which the defendant is liable to the trustee, after the application of any credit, shall then be paid to the trustee.

Additionally, the defendant may file with this court a proof of claim for such amount within thirty days after payment reflecting the precise amount paid by the defendant to this estate. In accordance with Code § 502(h) such claim would be treated as if it had arisen before the filing of the involuntary bankruptcy petition.

### CONCLUSIONS OF LAW

1. The plaintiff has failed to establish that the debtor made a constructively fraudulent transfer to the defendant in violation of 11 U.S.C. § 548(a)(2) in violation of Sections 272, 273 and 274 of the New York Debtor and Creditor Law.

2. The plaintiff has established that the debtor's transfer of inventory to the defendant did not comply with the requirements of the New York Bulk Transfer Act incorporated in Article 6 of the New York Uniform Commercial Code and that such transfer was ineffective against the debtor's trustee in bankruptcy, who stands in the shoes of an existing unsecured creditor who may properly object to the transfer.

3. The defendant must account for and is liable to the plaintiff for the value of the transferred inventory, which was found to be worth $66,766.32 at the time of the transfer.

4. The plaintiff is entitled to a judgment against the defendant for $66,766.32, less any credit for any proceeds from the voided bulk sale that are traceable to the funds held by the trustee in bankruptcy.

SUBMIT ORDER ON NOTICE.